UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MY MAVENS LLC,

                    Plaintiff,

        - against -

GRUBHUB, INC. and WENJUN ZHANG,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

20 Civ. 4657 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

         This lawsuit involves restaurant ordering and reviewing websites.  Plaintiff My

Mavens, LLC, a food technology company, alleges that Defendant Grubhub, Inc. and pro se

Defendant Wenjun Zhang,[1] a former Grubhub employee, conspired to misappropriate My

Mavens' proprietary "functionalities," via a scheme in which Zhang participated in a "coding

challenge" with My Mavens in order to gain access to My Mavens' confidential information.

The Amended Complaint asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836,

as well as state law claims for breach of contract, unjust enrichment, misappropriation of trade

secrets, tortious interference, unfair competition, fraudulent inducement, and breach of fiduciary

duty.  (Dkt. No. 27)

         Grubhub has moved to dismiss all claims against it, pursuant to Rule 12(b)(6).  In

the alternative, Grubhub seeks summary judgment as to certain claims, which it contends are

time-barred.  (Dkt. No. 41)  Zhang has moved to dismiss Plaintiff's claims against him – other

than the breach of contract claim – pursuant to Rule 12(b)(6).  He has also joined Grubhub's

_____

[1]  Zhang was initially represented by counsel.  This Court granted his lawyer's motion to
withdraw on February 17, 2022, after the instant motion was fully briefed.  (Dkt. No. 58)

motion for summary judgment on statute of limitations grounds.  (Dkt. No. 47)  Grubhub has

moved to strike the Amended Complaint's allegations concerning Grubhub's Code of Conduct,

pursuant to Fed. R. Civ. P. 12(f) (Grubhub Br. (Dkt. No. 42) at 18-19; Grubhub Reply Br. (Dkt.

No. 46) at 10-11), and My Mavens has moved to strike a declaration submitted by Grubhub

product manager Ryan Bowersock in support of Grubhub's motion for partial summary

judgment pursuant to Fed. R. Civ. P. 56.  (Pltf. Opp. (Dkt. No. 45) at 12-13)[2]

      For the reasons stated below, Grubhub's motion to strike will be granted; My

Mavens' motion to strike will be denied as moot; Defendants' motions to dismiss will be

granted; and Defendants' motion for partial summary judgment will be denied as moot.

## BACKGROUND[3]

      Plaintiff My Mavens, LLC "is a food technology development company

organized in August 2013. . . .  My Mavens owns and operates PlateRate, an e-commerce

business aimed at helping its users create the ultimate dining experience by locating the best food

that meets their dietary restrictions, recommends food that meets their flavor profile, and tracks

portion sizes."  (Am. Cmplt. (Dkt. No. 27) ¶¶ 18, 22)  My Mavens' sole member is its "founding

principal, Garrett Lang," who resides in New Jersey.  (Id. ¶ 25; May 3, 2023 Pltf. Ltr. (Dkt. No.

60))

---

[2]  The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

[3]  The Court's factual statement is drawn from the Amended Complaint.  The well-pleaded facts
alleged in the Amended Complaint are presumed true for purposes of resolving Grubhub's
motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir.
2007).  On a Rule 12(b)(6) motion to dismiss, courts consider – in addition to facts alleged in a
complaint – "documents attached to the complaint as exhibits, and documents incorporated by
reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)
(citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); and Hayden v. County
of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).  "Where a document is not incorporated by

"Defendant Grubhub, Inc. (NYSE: GRUB) is a leading online and mobile food-ordering and delivery marketplace that claims to have the largest and most comprehensive network of restaurant partners, as well as nearly 24 million active diners." (Am. Cmplt. (Dkt. No. 27) ¶ 20)  "Grubhub is a Delaware corporation with a principal place of business in Chicago, Illinois." (Id. ¶ 12)

"Defendant Wenjun Zhang is an adult individual who, upon information and belief, resides [in] Mountain View, California 94043.  Mr. Zhang was employed as a senior software engineer at Defendant Grubhub from November 28, 2016 until August 2, 2019. [During] that time, he was resident in Grubhub's New York office." (Id. ¶ 11)

The Amended Complaint alleges diversity, federal question, and supplemental jurisdiction, pursuant to 28 U.S.C. §§ 1332, 1331, and 1367, respectively.  (Id. ¶¶ 13-14)

# I.   FACTS

## A.   Initial Contact Between Zhang and My Mavens Principal Garrett Lang

The Amended Complaint alleges the following facts concerning the initial contact between Defendant Zhang and Garrett Lang, the principal of My Mavens:

> On or about March 23, 2017, Plaintiff's founding principal, Garrett Lang, met Defendant Wenjun Zhang.  During that chance meeting, Defendant Zhang told Mr. Lang that he was a software developer and the two talked about My Mavens and PlateRate.
>
> That evening, after Defendant Zhang expressed interest in learning more, Mr. Lang told Defendant Zhang that Plaintiff was in the process of developing new innovations that would revolutionize the online food-ordering industry.  Mr. Lang informed Defendant Zhang that Plaintiff was conducting a coding challenge through which Plaintiff would begin to and continue to build the code for some novel proprietary search functionalities that Plaintiff had developed. . . .  If the candidates passed the coding challenge and provided services building the code to

---

reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

bring the proprietary and confidential search functionalities to fruition, they
would be rewarded with an equity ownership stake in Plaintiff.

During the conversation, Defendant Zhang disclosed that he was employed by
Grubhub and based on his background and the perception of his knowledge base
and skillset, Plaintiff was interested in Defendant Zhang participating in
Plaintiff's coding challenge.  For that reason, during that initial meeting,
Defendant Zhang requested Mr. Lang's contact information so he could learn
more about the coding challenge and otherwise pursue potential opportunities
with Plaintiff.

(Id. ¶¶ 25-28 (formatting altered))

According to the Amended Complaint,

[s]hortly [after this meeting], Defendant Zhang emailed Mr. Lang again
expressing interest in participating in an interview process that Plaintiff was
conducting in the hopes that he could obtain an equity stake in My Mavens.  Mr.
Lang told Mr. Zhang that he would be willing to share more specific information
with him about the potential opportunity to obtain an equity interest in Plaintiff in
exchange for Defendant Zhang's agreement to help develop the coding sequence
that would bring Plaintiff's revolutionary ideas to life.

(Id. ¶ 29)

## B.    The Non-Disclosure Agreement

The Amended Complaint alleges that "before [Plaintiff and Zhang] could proceed

[with the interview process], Plaintiff required Defendant Zhang to execute a restrictive non-

disclosure agreement [(the 'NDA')] that was necessary to ensure that Defendant Zhang did not

share information about Plaintiff's novel and proprietary business concepts with his employer,

Grubhub." (Id. ¶ 30)[4]  Lang and Zhang electronically executed the NDA on March 25, 2017.[5]

(Id. ¶ 121; NDA (Dkt. No. 61-2) at 1-2)

The NDA provides as follows:

> **WHEREAS**, the Disclosing Party [My Mavens, LLC] intends to communicate or deliver certain information to the Recipient [Wenjun Zhang] pertaining to its business and prospective business, including, without limitation, know-how, inventions, processes, designs, business plans, projected financial information, information about specific projects, and information about intellectual property and trade secrets;

> **WHEREAS**, the Disclosing Party intends to disclose to the Recipient certain confidential and proprietary information relating to _____All business development/creation conversations between and the Recipient and My Mavens, LLC team members_____ for the purposes of _____creating a software product for My Mavens, LLC to help people find food they love_____; and

---

[4]  In its briefing, Grubhub cites a March 23, 2017 email that Lang sent to Zhang.  (Grubhub Br. (Dkt. No. 42) at 9, 19)  The Amended Complaint makes no mention of this email, however.  Accordingly, the email is not incorporated by reference in the Amended Complaint.

Where a document is not attached as an exhibit to a complaint, for it "[t]o be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the document[].' '[L]imited quotation' of documents not attached to the complaint 'does not constitute incorporation by reference.'" Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003), and Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985)) (second set of brackets in Madu; further citation omitted).  Accordingly, when a "complaint makes no explicit reference to, nor does it quote at all from" an email, but rather, "make[s] a single implicit reference to the email correspondence," that email is not incorporated by reference. Madu, 265 F.R.D. at 124.

Moreover, because the Amended Complaint does not "'rel[y] heavily upon [the March 23, 2017 email's] terms and effect,'" the email is not "'integral' to the [Amended Complaint]." DiFolco, 622 F.3d at 111 (quoting Mangiafico, 471 F.3d at 398).  The email thus may not be considered in connection with Defendants' motions to dismiss.

[5]  Because the Amended Complaint "quote[s] extensively from" the NDA, the NDA is incorporated by reference. Tavenner v. Int'l Bus. Machines Corp., No. 21-CV-6345 (KMK), 2022 WL 4449215, at *2 (S.D.N.Y. Sept. 23, 2022) (citing Nat'l Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs., 850 F.2d 904, 910 n.3 (2d Cir. 1988)), aff'd, No. 22-2318, 2023 WL 4984758 (2d Cir. Aug. 4, 2023).

**WHEREAS**, the Disclosing Party desires to protect the confidentiality of the information that it may disclose to the Recipient.

**NOW THEREFORE**, for and in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

**Confidential Information**. Confidential Information shall mean any information of a confidential and/or proprietary nature (whether tangible or intangible in form) relating in any way to any work products or conversation topics/ideas delivered, either in writing or orally, including by electronic mail or via other electronic, social media or Internet means, by the Disclosing Party to the Recipient, including, without limitation, know-how; inventions; creations; prototypes; models; designs; manuals; descriptions; plans; drawings; schematics; production techniques; enhancements, adjustments or supplements to existing products or processes; tooling or machining processes or concepts; formulae; processes; concepts; software; web pages; modules; algorithms; architectures; structures; databases; pricing lists and information; sources of material; vendor information; supplier information; instructions; financial information; business plans; business ideas; business creations; marketing information; and, without limitation, other intellectual property rights, trade secrets and business secrets.  All information disclosed by the Disclosing Party to the Recipient regarding any of the foregoing items in this paragraph is hereinafter collectively referred to as "Confidential Information", regardless of whether such information is marked as "confidential."

**Use of Confidential Information**. During the course of the discussions and interactions between the parties, the Disclosing Party will disclose to the Recipient certain Confidential Information. These disclosures will be made in the Disclosing Party's reliance upon the confidential relationship between the parties and upon their agreement that the Recipient will:

(a) use such Confidential Information solely for the purpose of _____building software and a business to help people find food they love - with My Mavens, LLC, under the guidance of its officers_____;

(b) promptly return to the Disclosing Party, upon written request, any and all tangible material provided hereunder and concerning such Confidential Information, including all copies and notices; and

(c) upon written request or instruction, destroy copies or other indicia of Confidential Information, including electronic mail messages or other communications traded via electronic, digital or Internet means (including, without limitation, communications exchanged via social media and text messaging).

**Non-Disclosure**. The Recipient agrees to receive the Confidential Information of the Disclosing Party in confidence.  The Recipient agrees that it will treat such

Confidential Information in the same manner as it treats like information of its own that it does not wish to disclose to the public, but in all events it shall use at least a reasonable degree of care.  To that end, it will not make a copy of any Confidential Information the Disclosing Party delivers to it that is in documented form without the Disclosing Party's prior consent, and will return all such documented Confidential Information to the Disclosing Party as soon as practical and in every event immediately when discussions terminate.

**No License**. Nothing contained in this Agreement shall be construed as granting or conferring upon the Recipient any rights, assignment or license in any Confidential Information disclosed to it.

**No Obligations**. The furnishing of Confidential Information hereunder shall not obligate either party to enter into any further agreement or negotiation with the other, nor shall it obligate the Disclosing Party to refrain from entering into an agreement or negotiation with any other party.

**Termination of Obligations**. The obligation to protect the Confidential Information received hereunder shall continue for ten years following the delivery of the information.

**Acknowledgment of the Disclosing Party Reliance**. The Recipient hereby acknowledges and agrees that the Disclosing Party is relying, in good faith, upon the Recipient to honor the terms of this Agreement, and that any violation of this Agreement by the Recipient will be materially detrimental and harmful to the Disclosing Party, the Disclosing Party's business, and the Disclosing Party's founders and principals.

**Entire Agreement**. This Agreement constitutes the entire Agreement between the parties and supersedes any prior or contemporaneous oral or written representations with regard to the subject matter hereof.  This Agreement may not be modified except by a writing signed by both parties.

(NDA (Dkt. No. 61-2) at 1-2 (emphases and blank lines in original))

In the Amended Complaint, Plaintiff alleges that Lang "presented Defendant Zhang with [the NDA]" only after Zhang indicated an intent to "provide coding and software development services" to My Mavens, in the event that Zhang successfully completed the My Mavens coding challenge:

Defendant Zhang gave Plaintiff multiple assurances that he would provide coding and software development services in exchange for Plaintiff's agreement to provide him with an equity stake in Plaintiff.  Defendant Zhang made these assurances so Plaintiff could rest easy in telling Defendant Zhang about the ideas

7

and providing him access to the cloud-based drive containing additional detail about Plaintiff's novel concepts.

After receiving the assurances that he would provide coding services to Plaintiff if he successfully completed the coding challenge, Plaintiff presented Defendant Zhang with [the] non-disclosure agreement.

(Am. Cmplt. (Dkt. No. 27) ¶¶ 32-33)

### C.    Grubhub's Alleged Knowledge and Approval of the NDA and Zhang's Interview with My Mavens

In February 2017 – while serving as a software engineer at Grubhub – "Zhang executed the then-latest version of Grubhub's Code of Conduct, which, among other things, require[s] [Grubhub] employees to obtain permission from Defendant Grubhub to work on projects for other companies." (Id. ¶ 34)

The Amended Complaint further alleges – on information and belief that – (1) before Zhang executed the NDA, he "disclosed the meeting with Mr. Lang to Defendant Grubhub and subsequently requested and received . . . permission from Defendant Grubhub to work on the [My Mavens] project" (id. ¶ 35); and (2) "Defendant Zhang informed Defendant Grubhub that he [had] executed an NDA with Plaintiff." (Id. ¶ 47) According to Plaintiff, "Lang relied on the fact that Mr. Zhang complied with all his employment obligations with Grubhub." (Id. ¶ 35)

### D.    Lang's Disclosure of Information to Zhang

After Zhang signed the NDA, "Lang verbally presented the major competitive advantages of PlateRate, which included [proprietary information], to Mr. Zhang (the 'Oral Presentation'). The Oral Presentation, which typically lasted between 30 to 60 minutes, was given to all or nearly all [My Mavens] team members, but only after they signed an NDA." (Id. ¶ 48)

> After the Oral Presentation,
>
> Plaintiff granted Defendant Zhang access to a cloud-based file containing information about certain of My Mavens' proprietary food technology innovations[,] including its Proprietary Functionalities (hereinafter the "Cloud-Based Drive").
>
> To access the contents of the Cloud-Based Drive, Plaintiff was required to first grant access to a specific user at a specific email address.  Plaintiff could limit who could access each specific file contained in the Cloud-Based Drive.
>
> The Cloud-Based Drive contained, among other things, (i) a developer onboarding guide, (ii) a database model, (iii) a coding database, and, importantly (iv) a detailed spreadsheet outlining Mr. Lang's vision for the future of Plaintiff and how it would grow through the introduction of certain specified novel and proprietary functionalities that were not being used by any participant in the online food ordering industry (the "Roadmap").
>
> The Roadmap, in conjunction with the Oral Presentation, contained a detailed site map, a list of issues that needed to be fixed, as well as a list of team members who were working to bring Plaintiff's novel capabilities to fruition.  Significantly, the Roadmap and Oral Presentation contained a detailed list of several search and promotion capabilities that Plaintiff planned to implement on its website.

(Id. ¶¶ 50-53)

### 1.      The "Proprietary Functionalities"

The oral presentation and "Roadmap" that Zhang received included information about three features on which My Mavens was then working, which the Amended Complaint refers to as the "Proprietary Functionalities":

> One capability that was detailed in the Roadmap and the Oral Presentation was a concept that would offer discounts for the first user to review a restaurant menu item or to a customer the first time they ordered from a restaurant.  These first discount functionalities are collectively referred to as the "First-Time/One-Time Discounts Functionality." . . .
>
> Another capability detailed in the Roadmap and Oral Presentation would allow a potential patron to filter a restaurant's menu by items based upon specific dietary preferences (hereinafter, "Dietary Preference Filter").  Plaintiff first conceived the Dietary Preference Filter well before Defendant Zhang signed the NDA. . . .
>
> Finally, a third concept listed in the Roadmap was the concept of offering promotions during "happy hour deals."  Put another way, the site would generate

promotions on specific menu items that were only available during [a] certain
time of the day and certain days of the week (hereinafter, "Happy Hour Deals").

. . . .

At the time of Plaintiff's disclosure of the Proprietary Functionalities to
Defendant Zhang, no similar functionalities were available on any of Grubhub's
sites, nor were they available on the PlateRate website or otherwise available in
the public domain.  They were also not available and were not being used by any
other online food-delivery company.

(Id. ¶¶ 54-56, 58)

The Amended Complaint does not further describe the Proprietary Functionalities.

Plaintiff does not allege that Zhang was given access to any computer code

relating to the Proprietary Functionalities.  Instead, as discussed above, Plaintiff alleges that the

Oral Presentation and the "Roadmap" – from which Zhang learned of the Proprietary

Functionalities – set forth "a detailed site map, a list of issues that needed to be fixed, . . . a list of

team members who were working to bring Plaintiff's novel capabilities to fruition . . . . [and] a

detailed list of several search and promotion capabilities that Plaintiff planned to implement on

its website."  (Id. ¶¶ 48, 52-53)

According to the Amended Complaint, "[t]he First-Time/One-Time Discounts

Functionality was one of the primary ways Plaintiff was able to bring on new talent to help build

Plaintiff's website[,] as it was not being used in the food technology industry at the time."

Moreover, "[g]iven they were not in use, the[] [three] novel Proprietary Functionalities were

extremely valuable to Plaintiff as they would give it a competitive advantage to obtain new users

that would drive revenue to PlateRate."  (Id. ¶¶ 54, 59)  Accordingly, "Plaintiff invested

substantial time and expense to maintain the secrecy of each of the innovative Proprietary

Functionalities."  (Id. ¶ 60)

**E.**      **The Coding Challenge**

"After [Zhang was] granted access to Plaintiff's proprietary information including the Oral Presentation and Cloud-Based Drive, Plaintiff presented Defendant Zhang with a coding challenge to create an algorithm that would suggest menu items based upon a user's flavor profile." (Id. ¶ 61) For use in the coding challenge, "Plaintiff provided Defendant Zhang with access to Plaintiff's Github account. Github is an online software development tool for which Plaintiff paid and which was password-protected." (Id. ¶ 63) The Amended Complaint does not allege what proprietary code, if any, could be accessed through the Github account, however.

"During the coding interview, Defendant Zhang created code and a unit test for a functionality that would suggest restaurants and deals based on a user's self-determined flavor profile." (Id. ¶ 64) Zhang "successfully complete[d] the coding challenge." (Id. at p. 13, ¶ j)

**F.**      **Zhang Allegedly Discloses the Proprietary Functionalities to Grubhub**

The Amended Complaint alleges that "[d]uring [the interview process with My Mavens], Defendant Zhang became privy to the Oral Presentation and accessed and reviewed the information in the Cloud-Based Drive and, upon information and belief, shared details of the same with representatives of Defendant Grubhub, who began to develop code to offer the functionalities on the Grubhub website." (Id. ¶ 65) The Amended Complaint does not allege, however, that Zhang disclosed any My Mavens computer code to Grubhub.

11

G.     **Zhang Informs Lang that He Will Not Pursue the My Mavens Opportunity**

In an April 26, 2017 email to Zhang,[6] Lang writes:

Hi Wenjun,

Any chance you can demo what you did re:  the flavor profile matching algorithm at some point?

Are you interested in taking on additional github issues on the project?

Kind regards,

Garrett

Zhang did not respond, and Lang follows up in a May 7, 2017 email:

Hi Wenjun,

What's your phone # again, I seem to have lost it . . .

Garrett

Zhang replied to Lang's email the next day, May 8, 2017:

Hi Garrett,

Sorry for the late response.

Life is a bit hectic recently.  After [a] second thought, I don't think this is the right timing for me to join this project.

The code + unit test is pretty self-explained.  Not sure what you['d] like to see more [of] from [a] demo.

Thanks!

---

[6]  The Amended Complaint refers to this email thread by date, sender, and recipient, and quotes from it.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 66-68)  Accordingly, this email thread is incorporated by reference in the Amended Complaint.  See S.E.C. v. Wey, 246 F. Supp. 3d 894, 929 & n.9 (S.D.N.Y. 2017) (citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)).

In a May 9, 2017 reply email, Lang writes:

Hi [Wenjun],

No problem, we'll see if we can test your code and leverage it in the app.  Sorry the timing isn't right now . . .  If you change your mind in the future feel free to reach out if life is a little less hectic.  If our company is even half as successful as I think it will be, you will make more $ with me in equity than you will anywhere else.

Kind regards,

Garrett

(Weber Decl., Ex. B. (Dkt. No. 44-2) at 2 (ellipses in original))

Although the Amended Complaint asserts that Zhang "[i]nexplicably [r]esign[ed]" from My Mavens in his May 8, 2017 email (Am. Cmplt. (Dkt. No. 27) at p. 14, ¶ k), Plaintiff does not allege that Zhang ever (1) accepted a position as a My Mavens employee, or (2) agreed to any sort of going-forward relationship with My Mavens.

## H.   Grubhub's Dietary Filter

"On June 17, 2017, Mr. Lang noticed Grubhub's functionality to filter menu items by dietary preferences."  "Grubhub prominently displayed [this functionality] on their website in 'beta' mode."[7]  (Id. ¶ 70)

Later that day, Lang emailed Zhang[8]:

Hi Wenjun,

You didn't talk about dietary restrictions with anyone at grubhub, did you?  It seems seamless just recently introduced dietary restrictions when they haven't had

---

[7] "[I]n the initial beta testing phase, [a website feature] is made available to a limited number of people for the purposes of testing and fixing any bugs in the service."  Weiss v. Barc, Inc., No. 12 CV 7571 TPG, 2013 WL 2355509, at *2 (S.D.N.Y. May 29, 2013).

[8] The Amended Complaint refers to the June 17, 2017 email thread by date, sender, and recipient, and summarizes its contents.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 71-72)  Accordingly, this email thread is incorporated by reference in the Amended Complaint.  See Wey, 246 F. Supp. 3d at 929 & n.9.

it for many years . . . The timing of you joining the team was a little unusual . . .
Just wanted to touch base to be sure you didn't accidentally tell someone in
seamless/grubhub what we're up to.

Kind regards,

Garrett

(Zhang Decl., Ex. A (Dkt. No. 48) at 4)[9]

Later that day, Zhang replied:

No, I didn't mention [to] anyone at Grubhub . . . what you are doing.  Actually I
am not quite sure what you mean by dietary restrictions.

. . . .

What do you mean "The timing of you joining the team was a little unusual"?  I
didn't know you before, okay?

Also please unsubscribe whatever you set up with my email.  I try to keep a clean
Spam box.

(Id.)

In a June 18, 2017 email, Lang replies:

Wenjun, seamless has been in business since 1999 . . . They have never had
dietary restrictions on their platform.  Several months after I told you under NDA
that we were going to focus on dietary restrictions, seamless decided – after 17
years of not doing it – that they would add dietary restrictions to their website . . .
I don't think you can blame me for asking the question.  I will trust you're being
honest with me, but please don't be rude for me asking the question, [it's] a very
reasonable question to ask if you look at the context . . . If I learn more about the
situation in the future, I will adjust my stance accordingly.

I've removed you from the team list so you shouldn't get any more emails, per
your request.

(Id.)

---

[9] "Seamless" is part of "[t]he Grubhub portfolio of brands."  (Am. Cmplt. (Dkt. No. 20) ¶ 27)

> Still uncertain as to whether it was the same functionality as the Dietary
> Preference Filter Functionality, Mr. Lang used the website to filter multiple
> Grubhub property menus to see how the functionality worked.  He soon learned
> that the functionality offered by Grubhub was identical to the . . . Dietary
> Preference Filter Functionality that Plaintiff had disclosed to Defendant Zhang in
> the roadmap document a few months earlier.

(Am. Cmplt. (Dkt. No. 27) ¶ 73)  The Amended Complaint does not allege, however, when Lang

"used the website to filter multiple Grubhub property menus to see how the functionality

worked."  Nor does Plaintiff allege what aspects of "the functionality offered by Grubhub [were]

identical to the . . . Functionality that Plaintiff had disclosed to Defendant Zhang," or how the

similarities were apparent to Lang.  (Id.)

## I.     Subsequent Events Involving the Proprietary Functionalities

Plaintiff alleges that "[i]n July 2017, Grubhub began developing 'Restaurant-

Targeted Promotions,' which allow[] restaurants to provide discounts to first time users and one-

time discounts on certain menu items in the same fashion as the First-Time/One-Time Discounts

Functionality."  "[A]nticipating that Grubhub would also copy this idea and launch it," on

October 24, 2017, Plaintiff filed a patent application for First-Time/One-Time Discounts, which

"was filed in a manner so that it was not available for public viewing or access."  The patent

application was "still pending . . . as of the date of [the Amended Complaint]."[10]

"By the end of 2017, Grubhub was sending out mass-marketing emails to all users

promoting the First-Time/One-Time Discounts Functionality."  Plaintiff contends that Grubhub

initially placed "information about the first-time discounts into the footer of [its promotional

emails]," instead of displaying the information more prominently, "to hide the fact that it had

stolen Plaintiff's novel idea."  (Id. ¶¶ 74-76)

---

[10] U.S. Provisional Patent Application 62/576,198.

The Amended Complaint also alleges that "[i]n December 2017, Grubhub began developing happy hour deals identical to the Plaintiff's Happy Hour Deals." (Id. ¶ 76) But Plaintiff does not assert that Grubhub ever launched this feature.

The Amended Complaint goes on to allege that

> Grubhub's unauthorized integration of Plaintiff's Proprietary Functionalities ha[s] now placed those functionalities in the public domain and now others have begun to integrate them as well. As a result, My Mavens has been prevented from capitalizing on its Proprietary Functionalities, thereby stunting PlateRate's and [My Mavens'] potential growth and profits. As of 2019, Defendant Grubhub estimated that 20% of its revenue was driven by discounts and other member loyalty promotions. . . . Plaintiff has been damaged in an amount to be determined at trial, believed to be hundreds of millions of dollars.

(Id. ¶¶ 80-82 (formatting altered))

The Amended Complaint does not allege that My Mavens ever launched the Proprietary Functionalities.

## II.   PROCEDURAL HISTORY

The Complaint was filed on June 17, 2020. (Dkt. No. 1)

In November 2 and November 3, 2020 letters, Grubhub and Zhang sought permission to move to dismiss the Complaint, contending that My Mavens' misappropriation of trade secret claims, unfair competition claims, and tortious interference claim are time-barred, and that the Complaint does not state claims for relief. (Dkt. Nos. 18-19) On December 3, 2020, this Court entered a briefing schedule that made Defendants' motions to dismiss due on December 24, 2020. (Dkt. No. 24)

On January 14, 2021, after Defendants' motions to dismiss had been served, Plaintiff filed the Amended Complaint. (Dkt. No. 27) The Amended Complaint asserts (1) violations of the Defend Trade Secrets Act, and state law claims for misappropriation of trade secrets, unfair competition, unjust enrichment, and "conspiracy to commit common law fraud

and other torts" as against both Defendants; (2) breach of contract, fraudulent inducement, and breach of fiduciary duty as against Zhang; and (3) tortious interference with contract as against Grubhub.  (Id. ¶¶ 83-152)[11]

In January 25 and 28, 2021 letters, Grubhub and Zhang sought permission to move to dismiss the Amended Complaint, for substantially the same reasons as stated in their pre-motion letters regarding the Complaint.  (Dkt. Nos. 28-29)

In an August 4, 2021 Order, this Court directed the parties to "conduct [30 days of] discovery focused on the statute of limitations issues set forth in Defendants' pre-motion letters."  (Dkt. No. 32 at 1)

On October 13, 2021, this Court entered a briefing schedule for Defendants' proposed motions to dismiss.  (Dkt. No. 36)  The scheduling order directs that "[t]o the extent that Defendants seek to rely on discovery materials not properly before the Court on a Rule 12(b)(6) motion, they will style their motions as partial motions for summary judgment."  (Id.)

On December 3, 2021, Defendants moved to dismiss all claims except for the breach of contract claim against Zhang.  In the alternative, Defendants moved for summary judgment on (1) Plaintiff's Federal and state trade secret claims and unfair competition claims,

---

[11] The Amended Complaint's second cause of action is for the imposition of a constructive trust as to Grubhub.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 90-92)  "New York law is clear that a constructive trust is an equitable remedy" and not a cause of action.  In re First Cent. Fin. Corp., 377 F.3d 209, 216 (2d Cir. 2004); see Moak v. Raynor, 28 A.D.3d 900, 902 (3d Dept. 2006) ("[A] constructive trust is an equitable remedy."); Rest. (3d) Restitution and Unjust Enrichment § 55 (2011) (describing a constructive trust as a "remedy").  Because a constructive trust is a remedy and not a standalone cause of action, the Amended Complaint's claim for a constructive trust will be dismissed.  See Blank v. TriPoint Glob. Equities, LLC, 338 F. Supp. 3d 194, 220 (S.D.N.Y. 2018) ("[S]ince courts have held that a constructive trust is a 'remedy' and not 'the basis for a separate cause of action,' this claim is dismissed without prejudice.") (quoting I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC, 280 F. Supp. 3d 524, 545 (S.D.N.Y. 2017) (same)).

arguing that they are time-barred to the extent premised on Plaintiff's "Dietary Preference Filter"; and (2) Plaintiff's tortious interference claim against Grubhub, arguing that it is time-barred.  Defendants also moved to strike the Amended Complaint's allegations regarding Grubhub's Code of Conduct, pursuant to Fed. R. Civ. P. 12(f).  (Grubhub Mot. (Dkt. No. 41); Zhang Mot. (Dkt. No. 47); Grubhub Br. (Dkt. No. 42) at 18-19; Grubhub Reply Br. (Dkt. No. 46) at 10-11)  In opposing Defendants' motions to dismiss and for partial summary judgment, Plaintiff moved to strike a declaration from Grubhub project manager Ryan Bowersock. Grubhub had submitted the Bowersock declaration (Dkt. No. 43) in support of its motion for partial summary judgment pursuant to Fed. R. Civ. P. 56.  (See Grubhub Br. (Dkt. No. 42) at 21) In moving to strike the Bowersock declaration, My Mavens argues that the declaration includes three emails that are hearsay, and thus not admissible on a Rule 56 motion for summary judgment.  (Pltf. Opp. (Dkt. No. 45) at 12-13)

## DISCUSSION

## I.   GRUBHUB'S RULE 12(f) MOTION TO STRIKE

Pursuant to Fed. R. Civ. P. 12(f), Grubhub has moved to strike the Amended

Complaint's allegations regarding Grubhub's Code of Conduct, arguing that they are based on

settlement negotiations conducted pursuant to Fed. R. Evid. 408.  (Grubhub Br. (Dkt. No. 42) at

18-19; Grubhub Reply Br. (Dkt. No. 46) at 10)

### A.   Background

The Complaint – which was filed on June 17, 2020 – does not reference either (1)

Grubhub's Code of Conduct or (2) Grubhub's alleged approval of Zhang's participation in My

Mavens' "coding challenge." (Dkt. No. 1)

On October 21, 2020 – in response to Plaintiff's settlement demand – Grubhub's

lawyer, A. Michael Weber, sent My Mavens' counsel, Todd Kremin, a letter bearing the legend

"For Settlement Purposes Only FRE408." (Weber Decl. (Dkt. No. 44) ¶ 6; Oct. 21, 2020 Weber

Ltr. (Dkt. No. 62-1) at 2)  Weber's letter states, in relevant part, that

> Grubhub's investigation has not uncovered any conversations between Mr. Zhang
> and anyone at Grubhub regarding his dealings with Plaintiff or [My Mavens
> principal] Garrett Lang.  Grubhub would not have authorized or permitted those
> dealings.  On February 13, 2017, Mr. Zhang signed the then-latest version of
> Grubhub's Code of Conduct, which, among other things, stated: "Employees are
> not to engage in outside work or conflicting outside activities that otherwise
> compete with the Company." Any engagement with such an outside activity
> would have to be approved, in writing, by the employee's supervisor pursuant to a
> formal request.  Mr. Zhang never made any such request.

(Oct. 21, 2020 Weber Ltr. (Dkt. No. 62-1) at 3 (ellipses omitted))

Plaintiff filed the Amended Complaint on January 14, 2021, about three months

after the October 21, 2020 settlement letter from Grubhub's counsel.  (Dkt. No. 27)  The

Amended Complaint contains the following new allegations regarding Grubhub's Code of

Conduct:

> A little more than a month [before meeting My Mavens' principal, Lang], Mr. Zhang executed the then-latest version of Grubhub's Code of Conduct, which, among other things, required employees to obtain permission from Defendant Grubhub to work on projects for other companies.
>
> Upon information and belief, Defendant Zhang disclosed the meeting with Mr. Lang to Defendant Grubhub and subsequently requested and received such permission from Defendant Grubhub to work on the project for Plaintiff.  Mr. Lang relied on the fact that Mr. Zhang complied with all [of] his employment obligations with Grubhub.
>
> Upon information and belief, Grubhub permitted Defendant Zhang to work on the outside project despite the Code of Conduct and employment agreement so Defendant Zhang could obtain access to Plaintiff's proprietary concepts that Defendant Grubhub would recreate on its own website.

(Am. Cmplt. (Dkt. No. 27) ¶¶ 34-36)

In a declaration, Weber states that "Plaintiff's allegations [in the Amended Complaint] regarding Grubhub's Code of Conduct, which Zhang signed on February [13], 2017, and Grubhub's alleged approval of his involvement with My Mavens are made without any basis in fact known to Plaintiff, but are instead taken out of context from a privileged settlement communication."  (Weber Decl. (Dkt. No. 44) ¶ 6 (citation omitted))  In its motion papers, Grubhub contends that "Plaintiff's new allegations concerning Grubhub granting 'approval' to Zhang to stray from the Code of Conduct could not possibly have any factual basis.  In other words, Plaintiff's misappropriation allegations amount to speculation based on speculation, which in turn was based on exculpatory evidence that Grubhub shared with Plaintiff in a privileged communication."  (Grubhub Br. (Dkt. No. 42) at 18-19)

In its opposition papers (Dkt. No. 45), My Mavens does not address, much less dispute, Grubhub's Rule 408 analysis and assertion that the Amended Complaint's allegations regarding Grubhub's Code of Conduct are based on a privileged settlement communication.

In its reply, Grubhub argues that – given Plaintiff's failure to address Grubhub's Rule 408 analysis – "the only proper remedy is to strike or disregard the offending allegations

from the complaint.  Settlement discussions are inadmissible to show fault under Fed. R. Evid.

408 and accordingly may be stricken from a complaint as immaterial and potentially prejudicial."

(Grubhub Reply Br. (Dkt. No. 46) at 10-11 (citations and quotation marks omitted))

### B.     Legal Standards

#### 1.     Rule 12(f) Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure provides that "[t]he court may

strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or

scandalous matter."  Although Rule 12(f) is not premised on inadmissibility, a court "may strike

. . . statements as immaterial and/or prejudicial [from a complaint] if those statements would be

inadmissible at trial."  Collier v. Boymelgreen Devs., No. 06CV5425(SJ), 2008 WL 835706, at

*10 (E.D.N.Y. Mar. 28, 2008).

In Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976), the

Second Circuit addressed a Rule 12(f) motion to strike premised on inadmissibility.  In Lipsky,

the complaint contained allegations regarding a previous SEC complaint against the defendant,

which had culminated in a consent decree.  The consent decree would have been inadmissible at

trial.  The district court granted the defendant's motion to strike the allegations regarding the

SEC action as "impertinent and immaterial."  Id. at 892-94 (quotation omitted).

On appeal, the Second Circuit stated that

> [i]n deciding whether to strike a Rule 12(f) motion on the ground that the matter
> is impertinent and immaterial, it is settled that the motion will be denied, unless it
> can be shown that no evidence in support of the allegation would be admissible.
> The Federal Rules of Civil Procedure have long departed from the era when
> lawyers were bedeviled by intricate pleading rules and when lawsuits were won or
> lost on the pleadings alone.  Thus the courts should not tamper with the pleadings
> unless there is a strong reason for so doing.
>
> Evidentiary questions, such as the one present in this case, should especially be
> avoided at such a preliminary stage of the proceedings.  Usually the questions of
> relevancy and admissibility in general require the context of an ongoing and

unfolding trial in which to be properly decided.  And ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone.

Id. at 893 (citations omitted).

The court went on to affirm the order granting the motion to strike, however:

We state these principles only to convey the care with which we affirm the district court's order.  Although it appears to us that the opinion of the SEC may well be relevant to the question whether [Commonwealth United] used its best efforts, we hold that neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings under the facts of this case.

This is a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues.  Consequently, it can not be used as evidence in subsequent litigation between that corporation and another party. . . .

Since it is clear that the SEC-[Commonwealth United] consent judgment, itself, can have no possible bearing on the [instant] action, the SEC complaint which preceded the consent judgment is also immaterial, for the purposes of Rule 12(f).

Id. at 393-94.

### 2.    Rule 408's Prohibition Regarding Evidence of Settlement Negotiations

Rule 408 of the Federal Rules of Evidence provides:

**(a) Prohibited Uses.**  Evidence of the following is not admissible – on behalf of any party – either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1) furnishing, promising, or offering – or accepting, promising to accept, or offering to accept – a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim – except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408(a) (emphasis in original).

> [T]he most commonly accepted rationale for Rule 408 is that it encourages
> settlement by protecting parties to a settlement agreement or negotiation from
> having their good-faith efforts to settle a dispute used against them in subsequent
> litigation.  As the Second Circuit has noted:  "Settlements have always been
> looked on with favor, and courts have deemed it against public policy to subject a
> person who has compromised a claim to the hazard of having a settlement proved
> in a subsequent lawsuit by another person asserting a cause of action arising out
> of the same transaction."                    .

Am. Soc. of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc., 912 F.2d

563, 580 (2d Cir. 1990) (formatting altered) (quoting Hawthorne v. Eckerson Co., 77 F.2d 844,

847 (2d Cir.1935)).

   The Advisory Committee's note to Rule 408 indicates that the drafters intended

that the Rule expand the scope of the common law exclusionary rule, which generally applied

only to settlement offers, and not to statements made during settlement negotiations:

> The practical value of the common law rule has been greatly diminished by its
> inapplicability to admissions of fact, even though made in the course of
> compromise negotiations, unless hypothetical, stated to be "without prejudice," or
> so connected with the offer as to be inseparable from it.  An inevitable effect is to
> inhibit freedom of communication with respect to compromise, even among
> lawyers.  Another effect is the generation of controversy over whether a given
> statement falls within or without the protected area.  These considerations account
> for the expansion of the rule herewith to include evidence of conduct or
> statements made in compromise negotiations, as well as the offer or completed
> compromise itself.

Fed. R. Evid. 408, 1975 Advisory Committee Note (citation omitted).

   The legislative history of Rule 408(a)(2) – as set forth in the notes accompanying

the Rule – indicates that Congress placed great importance on this subsection, because of its

ramifications for settlement.  After the Supreme Court proposed the initial version of the Rule,

the House Judiciary Committee initially deleted the sentence referring to "conduct or a statement

made during compromise negotiations," out of concern that it would hamper government

investigations and enforcement actions by permitting targets to exclude damaging evidence from

23

trial by first sharing it with the government during an investigation.  See Notes of Committee on the Judiciary, House Report No. 93–650.  The Senate Judiciary Committee rejected this change:

> The House amended the rule and would continue to make evidence of facts disclosed during compromise negotiations admissible.  It thus reverted to the traditional rule. . . . The real impact of this amendment, however, is to deprive the rule of much of its salutary effect.  The exception for factual admissions was believed by the Advisory Committee to hamper free communication between parties and thus to constitute an unjustifiable restraint upon efforts to negotiate settlements – the encouragement of which is the purpose of the rule.

Notes of Committee on the Judiciary, Senate Report No. 93-1277.

Accordingly, the Senate restored the language excluding evidence of conduct or statements made during compromise negotiations, and addressed the House's concern by adding an amendment stating that "the rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations."  The House accepted this approach.  See Notes of Conference Committee, House Report No. 93–1597.  Thus, the Rule as originally enacted in 1975 provided, as Rule 408(a)(2) does today, that "[e]vidence of conduct or statemen[ts] made in compromise negotiations is . . . not admissible."  PL 93-595, Jan. 2, 1975, 88 Stat 1926.

The Senate Judiciary Committee's amendment providing that the Rule "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations" was deleted in 2006.  The Advisory Committee has stated, however, that the sentence was merely "deleted as superfluous," and that "even without the sentence, the Rule cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations."  Fed. R. Evid. 408 Committee Notes on Rules – 2006 Amendment.

In Rein v. Socialist People's Libyan Arab Jamahiriya, 568 F.3d 345 (2d Cir. 2009), the Second Circuit noted that the "fundamental policy [concerns]" underlying Rule 408

operate to exclude consideration of settlement communications even when the Federal Rules of Evidence do not apply. In that case, the district court had relied on a settlement letter in deciding a dispute regarding an attorneys' fee award. The Second Circuit held that the district court had abused its discretion:

> We emphasize that our conclusion that the court made impermissible use of a settlement concession is not based on the fact that it violated a rule set forth in the Federal Rules of Evidence. Courts have differed over whether or to what extent the Federal Rules of Evidence govern disputes over attorneys' fees. Assuming without deciding that in determining questions of attorneys' fees, courts may employ hearsay within reasonable limits and have considerable discretion over adherence to Federal Rules, the rule forbidding such use of settlement negotiations is a matter of fundamental policy. The court essentially used [appellant's] conditional proposal to accept a particular monetary settlement as the basis for making an award of that amount. Were courts permitted to use provisional settlement concessions in that fashion, the possibilities of negotiating settlement in the future would be seriously impaired. See 2 McCormick on Evidence § 266 (Kenneth S. Broun ed., 6th ed. 2006) (noting the policy argument for barring the use of "an offer . . . to pay a sum in compromise . . . against that party" is "the promotion of settlement of disputes, which would be discouraged if offers of compromise were admitted"). While a district court enjoys wide discretion in its review of its award of attorneys' fees, the court's actions here exceeded the scope of its discretion.

Id. at 352-53 (footnote and further citations omitted; ellipses in original).

### C.   **Analysis**

As noted above, My Mavens does not deny that the Amended Complaint's allegations regarding Grubhub's Code of Conduct – and Zhang's execution of the Code of Conduct – are premised exclusively on Grubhub's October 21, 2020 settlement letter. Plaintiff likewise does not defend its use of the settlement letter under Rule 408(a)(2). Indeed, Plaintiff does not respond to, much less dispute, Grubhub's argument that it violated Rule 408.

The Court concludes that Grubhub's statements in its settlement letter concerning its Code of Conduct and Zhang's execution of the Code of Conduct constitute "statement[s] made during compromise negotiations about the claim" within the meaning of Rule 408(a)(2).

Accordingly, at trial, the portion of the settlement letter on which My Mavens has based its allegations concerning the Code of Conduct would be inadmissible "to prove or disprove the validity" of My Mavens' claims. Fed. R. Evid 408(a).

The Court therefore must consider whether allegations derived from Grubhub's settlement letter, which would be inadmissible at trial pursuant to Rule 408, should be stricken from the Amended Complaint pursuant to Rule 12(f).

The Second Circuit has not addressed the issue of how Rules 408 and 12(f) intersect. District courts in this Circuit have, however, consistently granted motions to strike portions of complaints that refer to settlement offers or statements made in the course of settlement negotiations, particularly where the statements are described as such. See Kelly v. L.L. Cool J., 145 F.R.D. 32, 40 (S.D.N.Y. 1992) ("The settlement discussions alleged by plaintiff violate Rule 408 and thus are stricken from the complaint pursuant to Rule 12(f)."), aff'd, 23 F.3d 398 (2d Cir. 1994); Collier, 2008 WL 835706, at *10 (E.D.N.Y. Mar. 28, 2008) ("Defendant requests that the Court strike from the record those portions of the Amended Complaint that make reference to the efforts at conciliation in which the parties engaged while the plaintiffs' claims were being considered by the EEOC. . . . Defendant's request is GRANTED and those portions of paragraphs 4 and 5 of the Amended Complaint are hereby stricken from the record.") (emphasis in original); Walczak v. Pratt & Whitney, No. 3:18-CV-563 (VAB), 2019 WL 145526, at *2 (D. Conn. Jan. 9, 2019) (granting motion to strike a paragraph that "directly refers to settlement negotiations and a corresponding settlement offer").

Some courts in this Circuit, however, have denied motions to strike allegations premised on facts that a party learned about during settlement negotiations. See United States v. Atl. Dev. Grp., LLC, No. 19CIV9551LJLRWL, 2020 WL 3421095, at *11 (S.D.N.Y. May 12,

2020) (Fair Housing Act case; denying motion to strike "allegations of accessibility violations" that were "derived from a consultant's report . . . that Defendants commissioned solely for settlement negotiations," because "the Government [would] have the opportunity to prove up those allegations with, inter alia, inspections of the buildings"), report and recommendation adopted, No. 19-CV-9551 (LJL), 2020 WL 3415631 (S.D.N.Y. June 22, 2020); Hallmark v. Cohen & Slamowitz, LLP, 283 F.R.D. 136, 140 (W.D.N.Y. 2012) (holding that "the fact that Defendants may have improperly attempted to collect a court filing fee . . . in violation of the [Fair Debt Collection Practices Act] constitutes a pre-existing fact or information falling outside the restrictions of Rule 408(a)(2)," and would therefore not be subject a Rule 12(f) motion to strike, because "[s]uch pre-existing information could readily be ascertained through discovery of Defendants, and its establishment at trial [did] not depend on admitting the statements [regarding the attempt to collect a court filing fee] made by Defendants to Plaintiff during their [settlement] conversation").

The cases denying motions to strike have relied in large part on the Advisory Committee's statement that Rule 408 "cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations."  Fed. R. Evid. 408 Committee Notes on Rules – 2006 Amendment; see Atl. Dev. Grp., 2020 WL 3421095, at *12; Hallmark, 283 F.R.D. at 140.

Here, in light of the aforementioned "fundamental policy" underlying Rule 408, and the Second Circuit's decisions in Lipsky and Rein, the Amended Complaint's allegations regarding Grubhub's Code of Conduct and Zhang's execution of the Code of Conduct will be stricken.

As discussed above, Rule 408 embodies the "promotion of the public policy favoring the compromise and settlement of disputes." Fed. R. Evid. 408, Advisory Committee Note. And, as the legislative history of Rule 408 demonstrates, the Rule's reference to "conduct or a statement made during compromise negotiations," Fed. R. Evid. 408(a)(2), is necessary for the achievement of that policy aim. Indeed, the Senate amended the House version of the Rule in order to preserve what it regarded as vital protection for conduct and statements associated with settlement negotiations.

And while <u>Lipsky</u> states that "questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial," that case does not announce a <u>per se</u> rule requiring the denial of Rule 12(f) motions to strike for reasons related to admissibility. Rather, <u>Lipsky</u> instructs that "courts should not tamper with the pleadings <u>unless there is a strong reason for so doing</u>." 551 F.2d at 893 (emphasis added). Moreover, the <u>Lipsky</u> court affirmed the granting of a motion to strike in that case, and did so based on an evidentiary analysis more attenuated than the issue here – <u>i.e.</u>, the court concluded that a reference to a prior SEC complaint should be stricken, because that complaint culminated in a consent decree, which the court analogized to an inadmissible <u>nolo</u> plea. <u>Id.</u> at 893-94.

And in <u>Rein</u>, the Second Circuit found "impermissible [the district court's] use of a settlement concession," even though that use did not technically "violate[] a rule set forth in the Federal Rules of Evidence." <u>Rein</u>, 568 F.3d at 352. In so holding, the court emphasized that "the rule forbidding such use of settlement negotiations is a matter of fundamental policy," <u>id.</u>, and that even where Rule 408 does not technically apply, the policy underlying it is binding on courts. "Were courts permitted to use provisional settlement concessions in [improper] fashion, the possibilities of negotiating settlement in the future would be seriously impaired." <u>Id.</u>

Here, there is "strong reason" for "tamper[ing] with the pleadings," Lipsky, 551 F.2d at 893: the policy concerns underlying Rule 408. As the drafters of the Rule recognized, it is critical that lawyers be able to communicate freely in settlement discussions. A rule permitting a party to cherry-pick statements made during settlement negotiations and use them later if settlement talks fail – even where the settlement negotiations admittedly took place under the rubric of Rule 408 – would have a chilling effect on settlement, and completely undercut the legislative purpose animating Rule 408.

The Advisory Committee note concerning "pre-existing information" does not shield the allegations here from a motion to strike. While the note provides that pre-existing evidence may come to light during discovery and may be admissible at trial, that does not mean that My Mavens may use Grubhub's settlement communication to salvage its otherwise insufficient claims against Grubhub. If a party could evade Rule 408 and the "fundamental policy" barring the use of settlement communications simply by not disclosing that the information at issue came from a settlement communication, Rule 408(a)(2)'s prohibition against the use of "conduct or a statement made during compromise negotiations" would be a dead letter.

For all these reasons, Grubhub's motion to strike will be granted. The Amended Complaint's allegations regarding Grubhub's Code of Conduct and Zhang's execution of the Code of Conduct will be disregarded.

II.    **DEFENDANTS' MOTIONS TO DISMISS**

A.    **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," Kassner, 496 F.3d at 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead

Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable

inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir.

2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,

507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice [to

establish entitlement to relief]." Iqbal, 556 U.S. at 678.

As discussed above, "[i]n considering a motion to dismiss for failure to state a

claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint,

documents attached to the complaint as exhibits, and documents incorporated by reference in the

complaint." DiFolco, 622 F.3d at 111 (citing Chambers, 282 F.3d at 153; Hayden, 180 F.3d at

54).  Moreover, "[w]here a document is not incorporated by reference, the court may

never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby

rendering the document 'integral' to the complaint." Id. (quoting Mangiafico, 471 F.3d at 398).

And on a motion to dismiss an amended complaint, a court may consider an earlier version of the complaint "'when evaluating the plausibility of [plaintiff's] claims.'" <u>Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.</u>, No. 18-CV-01790 (PMH), 2020 WL 2131771, at *13 n.6 (S.D.N.Y. May 4, 2020) (quoting <u>Perry v. Mary Ann Liebert, Inc.</u>, No. 17-CV-5600, 2018 WL 2561029, at *4 (S.D.N.Y. June 4, 2018), <u>aff'd</u>, 765 F. App'x 470 (2d Cir. 2019)).

### B.   Federal and State Law Trade Secret Claims

#### 1.   Applicable Law

Under the Defend Trade Secrets Act (the "DTSA"), "a party must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" <u>Free Country Ltd v. Drennen</u>, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (quoting <u>Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.</u>, No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016)); <u>see</u> 18 U.S.C. § 1839(5)(A)-(B).  The DTSA defines a trade secret as "any business information that, '(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) . . . derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the information.'" <u>Gen. Sec., Inc. v. Commercial Fire & Sec., Inc.</u>, No. 17 Civ. 1194 (DRH) (AYS), 2018 WL 3118274, at *4 (E.D.N.Y. June 25, 2018) (quoting 18 U.S.C. § 1839(3)(A)-(B)) (ellipses in <u>Gen. Sec., Inc.</u>).  "'Improper means' under the Act includes 'theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy,' but excludes 'reverse engineering, independent derivation, or any other lawful means of

31

acquisition.'" AUA Private Equity Partners, LLC v. Soto, No. 1:17-CV-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (quoting 18 U.S.C. § 1839(6)).

"'To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate:  (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.'" Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009) (quoting N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999)).

"Because '[t]he elements for a misappropriation claim under New York law are fundamentally the same' as a DTSA claim, 'courts have found that a complaint sufficiently plead[ing] a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law.'" Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc., 602 F. Supp. 3d 663, 671 (S.D.N.Y. 2022) (quoting Iacovacci v. Brevet Holdings, LLC, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020)) (further quotation omitted).  Similarly, courts in this Circuit cite to New York common law when deciding matters under the DTSA.  See, e.g., Art and Cook, Inc. v. Haber, 2017 WL 4443549, at *2, n.3 (E.D.N.Y. Oct. 3, 2017).

 2. **Analysis**

 a. **Protectable Trade Secrets**

"Generally, '[t]he existence of a trade secret is a question of fact.'" Town & Country Linen Corp. v. Ingenious Designs LLC, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021) (quoting LinkCo, Inc. v. Fujitsu Ltd., 2002 WL 237838, at *3 (S.D.N.Y. Feb 19, 2002)) (brackets in Town & Country), reconsideration denied, No. 18-CV-5075 (LJL), 2021 WL 4892857 (S.D.N.Y. Oct. 19, 2021).  To survive a motion to dismiss, however, a complaint must include enough detail to put the defendant on notice of the trade secrets at issue.  See Core SWX,

LLC v. Vitec Grp. US Holdings, Inc., No. 21CV1697JMAJMW, 2022 WL 3588081, at *5

(E.D.N.Y. July 14, 2022) ("While there is no heightened pleading standard under the DTSA,

'district courts in this circuit routinely require that plaintiffs plead their trade secrets with

sufficient specificity to inform the defendants of what they are alleged to have

misappropriated.'") (quoting Zabit v. Branometry, LLC, 540 F. Supp. 3d 412, 422 (S.D.N.Y.

2021)), report and recommendation adopted, No. 21CV1697JMAJMW, 2022 WL 3586570

(E.D.N.Y. Aug. 22, 2022).

Here, My Mavens describes the three "Proprietary Functionalities" alleged to be

trade secrets as follows:

> One capability that was detailed in the Roadmap and the Oral Presentation was a
> concept that would offer discounts for the first user to review a restaurant menu
> item or to a customer the first time they ordered from a restaurant.  These first
> discount functionalities are collectively referred to as the "First-Time/One-Time
> Discounts Functionality." . . .

> Another capability detailed in the Roadmap and Oral Presentation would allow a
> potential patron to filter a restaurant's menu by items based upon specific dietary
> preferences (hereinafter, "Dietary Preference Filter").  Plaintiff first conceived the
> Dietary Preference Filter well before Defendant Zhang signed the NDA. . . .

> Finally, a third concept listed in the Roadmap was the concept of offering
> promotions during "happy hour deals."  Put another way, the site would generate
> promotions on specific menu items that were only available during certain time of
> the day and certain days of the week (hereinafter, "Happy Hour Deals").

(Am. Cmplt. (Dkt. No. 27) ¶¶ 54-56)

The Amended Complaint's descriptions of the "Proprietary Functionalities"

present concepts and ideas.  These paragraphs do not adequately allege protectable trade secrets.

As an initial matter, My Mavens has not pled sufficient detail to put Defendants

on notice about what they allegedly misappropriated.  General categories of information amount

to trade secrets only when such general categories are tied to a specific feature of a product.  See

Core SWX, 2022 WL 3588081, at *5, *7 (Granting motion to dismiss where description of

alleged trade secrets as "proprietary and confidential information, including detailed product plans and marketing strategy documents and information concerning [two types of batteries]" did not provide adequate "notice as to the nature of the purported trade secret," because the description "merely ties two general categories to two products as opposed to a specific algorithm, specific portion of the product, or specific document. . . . No specific document within the product design information or marketing information is mentioned, nor were these general categories tied to a specific aspect of either battery product.").

Here, My Mavens does not allege which "specific aspect" of any of the Proprietary Functionalities Defendants misappropriated. Instead, the Amended Complaint merely (1) describes each feature as a "capability" or a "concept"; (2) states in broad terms what the "capability" or "concept" allows a user to do – e.g., get a "deal" during happy hour, or filter a menu by dietary preference; and (3) makes the vague assertion that Zhang "shared details of the same with representatives of Defendant Grubhub." (Id. ¶ 65) Plaintiff does not explain what "details" Zhang shared, or how these "details" relate to any particular aspect of the website features at issue.

Moreover, the broad concepts and ideas set forth in Plaintiff's "Proprietary Functionalities" are not trade secrets. In this regard, the Second Circuit has stated that the case law "militates strongly in favor of the conclusion that a new product idea" that will be open and visible once brought to market "cannot, as a matter of law, constitute a trade secret." Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1177 (2d Cir. 1993), abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368 (2d Cir. 2000).

> The district court in [LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492 (S.D.N.Y. 2002)] relied on th[is] dicta in Hudson [Hotels] to find that the architecture of a computer software program comprised of 26 elements was not a trade secret because "[o]nce the combination of [the plaintiff's]

elements is seen by the public, the system's architecture will become obvious and easily duplicated." 230 F. Supp. 2d at 499. The product in LinkCo was at the pre-marketing stage. . . . [O]ther courts in New York have relied on Hudson [Hotels'] dicta in finding that a new product idea is not a protected trade secret because, once it is marketed, the idea will no longer be a secret. See, e.g., Detsis v. Victoria's Secret Stores, Inc., No. 03–CV–5358, 2006 WL 2819586, at *6 (S.D.N.Y. Sept. 29, 2006) (finding that the novel concept of a necklace attached to bra straps was not a trade secret because it would be "readily apparent from the finished product, that once marketed, [would] become visible to all competitors to copy"); Blank v. Pollack, 916 F. Supp. 165, 175 (N.D.N.Y.1996) (finding that a folding window crank was not a trade secret because "upon marketing and sale" the design would be "open to public inspection of all of its features").

Scienton Techs., Inc. v. Computer Assocs. Int'l Inc., No. 04-CV-2652 JS ETB, 2013 WL 1856653, at *2, *4 (E.D.N.Y. May 1, 2013) (holding that the "idea or concept of combining certain program functionalities" in a security system was not a protectable trade secret); see 18 U.S.C. § 1839(3)(B) (providing that a trade secret must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information").

Here, the Amended Complaint does not allege that Defendants misappropriated source code or any other "internal processes of the software [that] are not readily identifiable, nor obvious and easily duplicated." Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc., 298 F. Supp. 2d 276, 284 (D. Conn. 2004). Instead, Plaintiff alleges that Defendants misappropriated the overall concepts or ideas of offering – on a restaurant ordering website – certain discounts and allowing users to filter menus by dietary preference. But if the Proprietary Functionalities had ever launched on My Mavens' website, any user of the site would have been able to tell that the First-Time/One-Time Discounts Functionality offered discounts based on initial reviews or initial orders of an item, that the Happy Hour Deals Functionality

offered discounts on select items during happy hour, and that the Dietary Preference Filter Functionality enabled website users to filter menus by dietary preference.

The Amended Complaint's allegations regarding Lang's discovery of Grubhub's alleged misappropriation of the Dietary Preference Filter Functionality illustrate this point. Lang allegedly "used the [Grubhub] website to filter multiple Grubhub property menus to see how the functionality worked," and discovered that Grubhub's Dietary Filter was "the same functionality as [My Mavens'] Dietary Preference Filter Functionality." (Am. Cmplt. (Dkt. No. 27) ¶ 73) It thus appears that the aspects of the dietary filter that Grubhub allegedly copied would be visible to any website user, and therefore do not constitute trade secrets.

For all these reasons, My Mavens has not adequately alleged that its "Proprietary Functionalities" are protectable trade secrets.[12]

### b.   Misappropriation

Even if (1) the Amended Complaint sufficiently alleged that the Proprietary Functionalities are trade secrets, and (2) the Amended Complaint's allegations concerning Grubhub's Code of Conduct and Zhang's execution of it could be considered, the Amended Complaint still would not plead a plausible claim of misappropriation, for the reasons explained below.

Under the DTSA,

the term "misappropriation" means

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

---

[12] The Court does not reach Grubhub's argument that Plaintiff's patent application destroyed any trade secret status that the Proprietary Functionalities previously enjoyed. (Grubhub Br. (Dkt. No. 42) at 16-17)

**(B)** disclosure or use of a trade secret of another without express or implied consent by a person who

> **(i)** used improper means to acquire knowledge of the trade secret; [or]

> **(ii)** at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was

>> **(I)** derived from or through a person who had used improper means to acquire the trade secret;

>> **(II)** acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

>> **(III)** derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . . .

18 U.S.C. § 1839(5)(A)-(B).

Accordingly, to allege misappropriation by Grubhub, Plaintiff must allege facts giving rise to a plausible inference that Grubhub "knew or had reason to know" that the Proprietary Functionalities were acquired through improper means – i.e., that Zhang improperly conveyed trade secrets he learned while under a duty of confidentiality to My Mavens.

The Amended Complaint alleges that Grubhub (1) knew of Zhang's interview with My Mavens; (2) authorized Zhang to participate in the interview; (3) knew of the NDA; (4) agreed with Zhang that Zhang would breach the NDA by revealing My Mavens' trade secrets; and then (5) used those trade secrets despite knowing that they had been misappropriated. The allegations supporting this theory of misappropriation are as follows:

> Upon information and belief, defendant Zhang informed Defendant Grubhub of his intention to work on the project for Plaintiff and Defendant Grubhub permitted the same so it could bring Plaintiff's confidential and proprietary business[s] concepts to the market before Plaintiff did.

> . . . .

A little more than a month [before meeting Lang, My Mavens' principal], Mr. Zhang executed the then-latest version of Grubhub's Code of Conduct, which, among other things, required employees to obtain permission from Defendant Grubhub to work on projects for other companies.

Upon information and belief, Defendant Zhang disclosed the meeting with Mr. Lang to Defendant Grubhub and subsequently requested and received such permission from Defendant Grubhub to work on the project for Plaintiff.  Mr. Lang relied on the fact that Mr. Zhang complied with all his employment obligations with Grubhub.

Upon information and belief, Grubhub permitted Defendant Zhang to work on the outside project despite the Code of Conduct and employment agreement so Defendant Zhang could obtain access to Plaintiff's proprietary concepts that Defendant Grubhub would recreate on its own website.

. . . .

Upon information and belief, authorized by Defendant Grubhub to proceed with the plan to misappropriate Plaintiff's proprietary and confidential concepts, Defendant Zhang executed a restrictive ten-year non-disclosure agreement with Plaintiff (hereinafter, the "Zhang NDA" or the "NDA").

. . . .

Upon information and belief, Defendant Zhang informed Defendant Grubhub that he executed an NDA with Plaintiff.

. . . .

Upon information and belief, Grubhub authorized Defendant Zhang to participate in Plaintiff's coding challenge.  Consequently, Plaintiff believed that there were no restrictions that precluded Defendant Zhang from participating in the coding challenge or otherwise working with Plaintiff.  Accordingly, both Grubhub and Plaintiff were aware [of] and sanctioned Defendant Zhang's participation in the coding challenge and intent to work with Plaintiff, and each agreed to let Defendant Zhang Proceed.

. . . .

Upon information and belief, Defendant Zhang disclosed that the Proprietary Functionalities came from My Mavens to Grubhub or, alternatively, Grubhub should have known of the origin based on its approval of Defendant Zhang's outside [business] activities.  As such, Grubhub specifically intended to (i) aid, abet, and otherwise assist in the misappropriation of the Proprietary Functionalities; (ii) profit from the misappropriated the Proprietary Functionalities; and (iii) benefit and profit from access to Plaintiff's trade secrets in order to gain market share and increase the success of its infringing activities.

. . . .

> As set forth more fully above, upon information and belief, Defendant Grubhub
> was aware of and permitted Defendant Zhang to work for Plaintiff and
> subsequently tortiously interfered with the contractual relationship between
> Plaintiff and Defendant Zhang, if any, and caused Defendant Zhang to breach
> contractual obligations owed to Plaintiff arising from the NDA.

(Am. Cmplt. (Dkt. No. 27) ¶¶ 7, 34-37, 47, 62, 78, 107)

The only fact in the above paragraphs that is not alleged on information and belief

is that in February 2017, Zhang executed Grubhub's Code of Conduct, which "required

employees to obtain permission from Defendant Grubhub to work on projects for other

companies." (Id. ¶ 34)  By contrast, the Complaint – which predates Grubhub's October 21,

2020 settlement letter disclosing Grubhub's Code of Conduct and Zhang's execution of the Code

– contains only the following conclusory allegation about Grubhub's knowledge of Zhang's

involvement with My Mavens:  "Upon information and belief, Defendant Grubhub had actual

knowledge of the existence and terms of the NDA." (Cmplt. (Dkt. No. 1) ¶ 51)  Grubhub's Code

of Conduct and Zhang's execution of it are thus the sole factual bases for the Amended

Complaint's allegations of Grubhub's knowledge of – and participation in – Zhang's alleged

misappropriation.

As an initial matter, "[a] litigant cannot merely plop 'upon information and belief'

in front of a conclusory allegation and thereby render it non-conclusory." Citizens United v.

Schneiderman, 882 F.3d 374, 384 (2d Cir. 2018).  While information and belief pleading is

permitted, such allegations must be "'based on factual information that makes the inference of

culpability plausible.'" Moreira v. Societe Generale, S.A., No. 20-CV-9380 (JMF), 2023 WL

359446, at *2 (S.D.N.Y. Jan. 23, 2023) (quoting Arista Recs., LLC v. Doe 3, 604 F.3d 110, 120

(2d Cir. 2010)).  Accordingly, plaintiffs who plead on information and belief must "accompany

their allegation[s] with factual assertions that 'raise a right to relief above the speculative

level.'" Id. at *3 (quoting Morana v. Park Hotels & Resorts, Inc., No. 20-CV-2797 (RA), 2021

WL 1164010, at *3 (S.D.N.Y. Mar. 26, 2021))  Where "the Court can infer no more than the

mere possibility of misconduct from the factual averments – in other words, if the well-pled

allegations of the complaint have not 'nudged [plaintiff's] claims across the line from

conceivable to plausible' – dismissal is appropriate." S.E.C. v. Thompson, 238 F. Supp. 3d 575,

587-88 (S.D.N.Y. 2017) (quoting Twombly, 550 U.S. at 570).

  Here, My Mavens alleges that Grubhub's Code of Conduct "required employees

to obtain permission from Defendant Grubhub to work on projects for other companies." (Am.

Cmplt. (Dkt. No. 27) ¶ 34)  My Mavens does not allege, however, that Grubhub required its

employees to obtain permission to participate in a job interview with another employer.  As

discussed below, the "coding challenge" in which Zhang participated was in the nature of a job

interview or tryout.  (See id. (Dkt. No. 27) ¶¶ 24, 27)  Zhang's successful handling of the

"coding challenge" was a prerequisite to any sort of relationship with My Mavens.  (Id. ¶ 27)

While Zhang successfully completed the "coding challenge," he declined to enter into any

relationship with My Mavens (id. ¶ 67), and the Amended Complaint's allegations confirm that

he did not "work on projects" for My Mavens.  Accordingly, the Amended Complaint does not

plausibly allege that Zhang's alleged interactions with My Mavens fall within the scope of the

Code of Conduct provision upon which Plaintiff relies.

  Even if Zhang's participation in the "coding challenge" could somehow be

interpreted to fall within the scope of Grubhub's Code of Conduct provision, the Amended

Complaint alleges – on "information and belief" – a ladder of suppositions that fail the

plausibility test.  Plaintiff posits that Zhang sought Grubhub's permission to participate in the

"coding challenge"; that Zhang told Grubhub about the NDA; that Zhang and Grubhub agreed

that Zhang would participate in the "coding challenge" in order to steal information concerning Plaintiff's Proprietary Functionalities; that, after the "coding challenge," Zhang shared Plaintiff's Proprietary Functionalities with Grubhub; and that Grubhub knew or should have known that Zhang had obtained the Proprietary Functionalities from My Mavens and shared them with Grubhub in violation of the NDA.  But the existence of the Code of Conduct and Zhang's execution of it do not demonstrate, suggest, or make it plausible that Zhang informed Grubhub of any documents or information he learned during the "coding challenge," much less that he informed Grubhub of the NDA.  See Frydman v. Verschleiser, 172 F. Supp. 3d 653, 674-75 (S.D.N.Y. 2016) (dismissing claim that a defendant "conspired to steal the Stolen Trade Secrets" and "effected the scheme through [another individual]" as conclusory).[13]

Apart from the "information and belief" allegations concerning Grubhub's supposed collusion with Zhang, Plaintiff relies on the timing of Grubhub's introduction of the online menu ordering features at issue.  Because these features appeared on Grubhub's website after Zhang's participation in the "coding challenge," Plaintiff contends that Grubhub's new online features were based on misappropriated trade secrets.  (Pltf. Opp. (Dkt. No. 45) at 26 ("A . . . reasonable inference is that this was no coincidence, especially considering the suspicious timing."))

According to the Amended Complaint, Grubhub "began developing" a feature that was similar to the First-Time/One-Time Discounts Functionality "[i]n July 2017" and "[i]n December 2017, . . . began developing happy hour deals identical to . . . Plaintiff's Happy Hour

---

[13]  Plaintiff's allegation that "Lang relied on the fact that Mr. Zhang complied with all his employment obligations with Grubhub" (Am. Cmplt. (Dkt. No. 27) ¶ 35) is nonsensical. Nothing in the Amended Complaint suggests that Lang had any knowledge of Zhang's "employment obligations with Grubhub" when he arranged for Zhang to participate in the "coding challenge."

Deals." (Am. Cmplt. (Dkt. No. 27) ¶¶ 74, 76)  Assuming <u>arguendo</u> that a restaurant ordering and reviewing website offering discounts for ordering an item, reviewing an item, or purchasing a product during happy hour could ever be inherently suspicious, the timing here is innocuous. Grubhub's product development concerning these features did not begin until months after Zhang's "coding challenge" with My Mavens.  In any event, Plaintiff "cites no legal authority for the proposition that a mere coincidence in timing can support an inference of trade secret use." <u>Spear Mktg., Inc. v. BancorpSouth Bank</u>, 791 F.3d 586, 601 (5th Cir. 2015).

The Court concludes that the Amended Complaint does not adequately plead a misappropriation claim under the DTSA or New York law.

### c.    Whether Plaintiff's New York Trade Secret Claim Against Zhang Is Duplicative of Plaintiff's Contract Claim[14]

Under New York law, "'[w]hen a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in fraud, conversion, and other torts are generally precluded, unless based on a duty independent of the contract.' . . . '[M]isappropriation claims [therefore] cannot lie where they are simply a restatement of a breach of contract claim.'" <u>Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.</u>, No. 14-CV-9687 (VEC), 2016 WL 4916969, at *9 (S.D.N.Y. Feb. 11, 2016) (quoting <u>Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy</u>, 449 F. App'x 57, 59 (2d Cir. 2011); and <u>Cereus Prod. Dev., Inc. v. Boom LLC</u>, No. 14 CIV. 4292(PAC), 2015 WL 3540827, at *7 (S.D.N.Y. June 5, 2015)).  Accordingly, New York trade secret claims are dismissed as

---

[14] The Court does not address whether the DTSA claim against Zhang is duplicative of Plaintiff's breach of contract claim against Zhang because the parties have not briefed the issue. <u>See</u> <u>PRCM Advisers LLC v. Two Harbors Inv. Corp.</u>, No. 20-CV-5649 (LAK), 2021 WL 2582132, at *14 (S.D.N.Y. June 23, 2021) (not reaching argument that "DTSA claim [was] duplicative of . . . breach of contract claim" when "[n]either party ha[d] addressed whether the same [tort] analysis applies to a statutory claim").

duplicative where the defendant has signed an NDA that prohibits misuse or sharing of trade secrets. See id. (granting motion to dismiss misappropriation claims that "are entirely based on alleged conduct that is proscribed by the . . . NDA [at issue]"); Linkable Networks, Inc. v. Mastercard Inc., 184 A.D.3d 418, 418 (1st Dept. 2020) (same).

Here, the NDA states that (1) My Mavens "intends to communicate or deliver certain information to [Zhang] pertaining to its business and prospective business, including . . . trade secrets"; (2) "Confidential Information shall mean any information of a confidential and/or proprietary nature . . . relating in any way to any work products or conversation topics/ideas delivered . . . by [My Mavens] to [Zhang], including . . . trade secrets"; (3) "disclosures will be made in [My Mavens'] reliance upon . . . their agreement that [Zhang] will . . . use such Confidential Information solely for the purpose of building software and a business to help people find food they love with My Mavens, LLC, under the guidance of its officers"; and (4) "[Zhang] agrees to receive the Confidential Information of [My Mavens] in confidence." (NDA (Dkt. No. 61-2) at 1-2)  Plaintiff's New York trade secret misappropriation claim addresses only conduct that is within the scope of the NDA.  Accordingly, Plaintiff's New York trade secret misappropriation claim against Zhang is duplicative of its breach of contract claim against Zhang and must be dismissed.

Plaintiff argues, however, that "the [Amended Complaint] clearly pleads [that] Defendants acted willfully and intentionally to harm Plaintiff" by "conspir[ing] together" before Zhang's interview with My Mavens, and that accordingly the Amended Complaint's New York trade secret misappropriation claim against Zhang is not duplicative of Plaintiff's breach of contract claim  against Zhang.  (Pltf. Opp. (Dkt. No. 45) at 29-30 (quotation omitted))  This argument is not persuasive.  While "a defendant [who] breaches [a] contract with a plaintiff . . .

may also breach an independent duty in tort if the defendant goes beyond mere breach of contract and acts in such a way that a trier of fact could infer that [he or she] willfully intended to harm the plaintiff," Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003), a plaintiff cannot merely dress up a contract claim with allegations of intentional conduct and thus convert it into a tort claim.  See Cauff Lipman & Co. v. Apogee Fin. Grp., Inc., No. 90 CIV. 5970 (KMW), 1991 WL 64197, at *1 (S.D.N.Y. Apr. 18, 1991) ("Under New York law, breach of contract, even if intentional or malicious, does not give rise to a tort action.").

Here, My Mavens contends that Zhang had an "independent duty not to misappropriate and disseminate Plaintiff's intellectual property and proprietary functionalities to unlicensed third parties," and that Zhang "'conspired together [with Grubhub] to carry about the . . . common plan, design, and scheme in a clandestine fashion to intentionally harm Plaintiff, and to advance Defendants' business interests and finances at Plaintiff's expense and detriment.'"  (Pltf. Opp. (Dkt. No. 45) at 29-30 (quoting Am. Cmplt. (Dkt. No. 27) ¶ 100))  But Zhang's purported "independent duty" falls squarely within the scope of the NDA.  And to the extent that Plaintiff alleges collusion between Zhang and Grubhub and willful conduct, these allegations are – as explained above – conclusory and implausible.  Plaintiff has thus alleged neither "an independent duty in tort" nor that Zhang "willfully intended to harm [it]."  Carvel, 350 F.3d at 16.

The cases Plaintiff cites are not on point here, because they involve adequately pled factual allegations of far more serious misconduct.  See Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 56 (1st Dept. 1988) ("[I]t is alleged that defendants, who had claimed to have 'scrapped,' that is, destroyed as damaged or as not selling, over 19,000,000 Beatles[] recordings, in fact, sold millions of such recordings in secret transactions and pocketed

the proceeds."); Albemarle Theatre, Inc. v. Bayberry Realty Corp., 27 A.D.2d 172, 174 (1st Dept. 1967) ("It is alleged that the defendant contracting parties, in order to improve the operating position of other theatres owned by them and run in competition to plaintiff's Albemarle Theatre, and to secure substantial additional income from refreshment concession operations in other theatres, not only failed to operate the Albemarle Theatre responsibly pursuant to the contract, but affirmatively, intentionally and [willfully] set out in conjunction with other defendants to destroy the value and utility of the Albemarle Theatre henceforth as a theatre.").

The Court concludes that Plaintiff's New York trade secret misappropriation claim against Zhang is duplicative of Plaintiff's breach of contract claim against Zhang.

*     *     *     *

For the reasons stated above, Defendants' motions to dismiss Plaintiff's DTSA and New York trade secret claims will be granted.

### C.   Tortious Interference with Contract Claim Against Grubhub

#### 1.   Applicable Law

"Under New York law, in order to state a claim of tortious interference with contractual relations, a plaintiff must allege five elements: '(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom.'" Medtech Prod. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 813 (S.D.N.Y. 2008) (quoting Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (internal quotations omitted); citing Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993)).

"With regard to the second element, the plaintiff must 'provide specific allegations' of the defendant's knowledge and cannot survive a motion to dismiss by making merely a 'conclusory assertion' of knowledge. 'Although a defendant need not be aware of all the details of a contract to be liable for tortious interference, it must have actual knowledge of a specific contract.'" Id. (quoting Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001), and Int'l Minerals & Res., Inc. v. Pappas, No. 87 Civ. 3988(PKL), 1992 WL 354504, *3 (S.D.N.Y. Nov. 17, 1992); citing Burns Jackson Miller Summit & Spitzer v. Lindner, 88 A.D.2d 50, 72 (2d Dept. 1982)). "Indeed, 'to avoid dismissal of a tortious interference with contract claim a plaintiff must support [its] claim with more than mere speculation.'" Id. (quoting Burrowes v. Combs, 25 A.D.3d 370, 373 (1st Dept. 2006)).

### 2. Analysis

As discussed above, the Amended Complaint does not plausibly allege that Grubhub knew about the NDA. My Mavens has thus not stated a claim for tortious interference with contract. Accordingly, that claim will be dismissed. See id.

### D. Unfair Competition Claim Against Grubhub and Zhang

### 1. Applicable Law

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001) (quotation omitted); see Carson Optical Inc. v. eBay Inc., 202 F. Supp. 3d 247, 267 (E.D.N.Y. 2016) ("[T]he essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another' and has done so in bad faith.") (citations and quotations omitted). New York's unfair competition law is a "broad and flexible doctrine

that depends more upon the facts set forth . . . than in most causes of action." <u>Telecom Int'l Am.,</u> <u>Ltd.,</u> 280 F.3d at 197.  The tort "'does not have boundless application as a remedy for unfair trade practices[, however]. . . . Rather, . . . the primary concern in unfair competition is the protection of a business from another's misappropriation of the business' organization or its expenditure of labor, skill, and money.'" <u>Gucci Am., Inc. v. Duty Free Apparel, Ltd.,</u> 277 F. Supp. 2d 269, 275 (S.D.N.Y. 2003) (quoting <u>Ruder & Finn Inc. v. Seaboard Sur. Co.,</u> 52 N.Y.2d 663, 671 (1981)).

New York law "'recognize[s] two theories of common-law unfair competition: palming [or passing] off and misappropriation.'" <u>Carson Optical Inc.,</u> 202 F. Supp. 3d at 267 (quoting <u>ITC Ltd. v. Punchgini, Inc.,</u> 9 N.Y.3d 467, 476 (2007)).  "Palming off . . . is the 'sale of the goods of one manufacturer as those of another.'" <u>Id.</u> at 267-68 (citations omitted).  "The second theory, misappropriation, prevents individuals from 'misappropriat[ing] the results of the skill, expenditures and labors of a competitor.'" <u>Id.</u> at 268 (quoting <u>Punchgini,</u> 9 N.Y.3d at 477) (brackets in <u>Carson Optical</u>).

2.    **Analysis**

a.    **Whether Plaintiff Has Stated an Unfair**
**Competition Claim Against Grubhub**

To state a claim for unfair competition against Grubhub, Plaintiff must allege facts showing that Grubhub acted in bad faith.  <u>See</u> <u>MiniFrame Ltd. v. Microsoft Corp.,</u> No. 11 Civ. 7419 (RJS), 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013) ("[T]he gravamen of an unfair competition claim[under New York law] is the bad faith misappropriation of a competitor's commercial advantage.") (citations omitted), <u>aff'd,</u> 551 F. App'x 1 (2d Cir. 2013); <u>Fairfield Fin. Mortg. Grp., Inc. v. Luca,</u> 584 F. Supp. 2d 479, 488 (E.D.N.Y. 2008) ("'In a common law unfair competition claim under New York law, the plaintiff must show . . . bad

faith.'" (quoting <u>Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.</u>, 58 F.3d 27, 35 (2d Cir. 1995)) (ellipsis in <u>Fairfield</u>).

       In attempting to show bad faith, Plaintiff relies on the same "information and belief" allegations discussed earlier in connection with Grubhub's alleged knowledge and collusion.  For the reasons explained above in connection with Plaintiff's trade secret misappropriation claims, these allegations are insufficient.  Because Plaintiff has not adequately alleged bad faith, its unfair competition claim against Grubhub will be dismissed.

### b.      Whether Plaintiff Has Stated an Unfair Competition Claim Against Zhang

       "'It is well-settled . . . that no claim [for unfair competition] lies where its underlying allegations are merely a restatement, albeit in slightly different language, of the "implied" contractual obligations asserted in the cause of action for breach of contract.'" <u>RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.</u>, No. 14 Civ. 6294 (LTS) (HBP), 2015 WL 5008762, at *5 (S.D.N.Y. Aug. 24, 2015) (quoting <u>Orange County Choppers, Inc. v. Olaes Enterprises, Inc.</u>, 497 F. Supp. 2d 541, 558 (S.D.N.Y. 2007)) (brackets in <u>RCA Trademark Mgmt.</u>).  "Where a plaintiff's unfair competition claim is based entirely on the same alleged conduct proscribed by contract, and plaintiff has pled a breach of contract claim, the unfair competition claim is dismissed as duplicative of the breach of contract claim." <u>Bytemark, Inc. v. Xerox Corp.</u>, 342 F. Supp. 3d 496, 508 (S.D.N.Y. 2018) (citing <u>ScentSational Techs., LLC v. PepsiCo, Inc.</u>, No. 13 Civ. 8645 (KMK), 2017 WL 4403308, at *18 (S.D.N.Y. Oct. 2, 2017); <u>Bancorp</u>, 2016 WL 4916969, at *9 (dismissing plaintiffs' unfair competition claim where it was "entirely based on alleged conduct that is proscribed by the 2010 NDA," and plaintiffs had not alleged that defendant "had any duty to them independent of the 2010 NDA, nor . . . alleged

circumstances extraneous to that contract in support of their non-contract claims"); and RCA Trademark Mgmt., 2015 WL 5008762, at *5-6)

Here, My Mavens' unfair competition claim against Zhang asserts that he "unlawfully misappropriated Plaintiff's property rights to his and Defendant Grubhub's commercial advantage in order to further their infringing activity and to obtain an unfair competitive advantage over Plaintiff in the marketplace." (Am. Cmplt. (Dkt. No. 27) ¶ 115) This claim is subsumed within Plaintiff's contract claim, for the same reasons discussed above in connection with Plaintiff's New York trade secret misappropriation claim against Zhang. The unfair competition claim is therefore duplicative and will be dismissed.

### E.   Fraudulent Inducement Claim Against Zhang

#### 1.   Applicable Law

"To state a claim for fraud in the inducement, [a plaintiff] must allege:  (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [the victim]; and (iv) resulting damages.  In addition, the plaintiff must allege specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011) (citing Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488 (2007), and Fed. R. Civ. P. 9(b)).

"[A] fraudulent inducement claim is duplicative of [a] breach of contract claim[] [where] it is predicated on an alleged expression of a future expectation or intent to perform, rather than on a misrepresentation of present fact." Pate v. BNY Mellon-Alcentra Mezzanine III, LP, 163 A.D.3d 429, 430 (1st Dept. 2018).  Accordingly, "[g]eneral allegations of lack of intent to perform are insufficient; rather, facts must be alleged establishing that the adverse party, at the

time of making the promissory representation, never intended to honor the promise." <u>Perella</u>

<u>Weinberg Partners LLC v. Kramer</u>, 153 A.D.3d 443, 449 (1st Dept. 2017).

### 2. **Analysis**

Here, the Amended Complaint alleges that

> Defendant Zhang gave Plaintiff multiple assurances that he would provide coding
> and software development services in exchange for Plaintiff's agreement to
> provide him with an equity stake in Plaintiff.  Defendant Zhang made these
> assurances so Plaintiff could rest easy in telling Defendant Zhang about the ideas
> and providing him access to the cloud-based drive containing additional detail
> about Plaintiff's novel concepts.

> After receiving the assurances that he would provide coding services to Plaintiff if
> he successfully completed the coding challenge, Plaintiff presented Defendant
> Zhang with [the] non-disclosure agreement.

> . . . .

> After Defendant Zhang signed the NDA, and after verbally agreeing to provide
> his services to Plaintiff in exchange for a potential equity stake in My Mavens,
> Plaintiff began the onboarding process by, among other things, providing access
> to proprietary information including providing the Oral Presentation.

(Am. Cmplt. (Dkt. No. 27) ¶¶ 32-33, 49)

In opposing Zhang's motion to dismiss, My Mavens argues that "[i]t is common

sense that Plaintiff would believe and rely on the assurance that Zhang was interested in joining

the team and thus leave the employ of Grubhub to participate in the coding challenge and gain

access to Plaintiff's ideas."  Plaintiff further contends that the Amended Complaint pleads

"allegations of misrepresentations of present fact [that] are not duplicative of mere promissory

statements."  (Pltf. Opp. (Dkt. No. 45) at 40, 42)

In sum, the Amended Complaint asserts that (1) prior to undertaking the "coding

challenge," Zhang told Lang that he would work for My Mavens if he successfully completed the

"coding challenge"; and (2) My Mavens reasonably relied on his assurances in sharing

confidential information with Zhang after he signed the NDA.  The Amended Complaint's

allegations are not sufficient to demonstrate the elements of materiality, reasonable reliance, and scienter, however.

The Amended Complaint alleges that – before undertaking the "coding challenge" – Zhang gave My Mavens "multiple assurances that he would provide coding and software development services in exchange for Plaintiff's agreement to provide him with an equity stake," in the event that Zhang "successfully completed the coding challenge." (Am. Cmplt. (Dkt. No. 27) ¶¶ 32-33 (alleging that Zhang gave his "assurances" before Lang's oral presentation), ¶ 61 ("After . . . the Oral Presentation . . . Plaintiff presented Defendant Zhang with a coding challenge . . . ."))[15] Accordingly, whatever assurances Zhang made were not given as a My Mavens employee.  At best, Zhang was a candidate for a position at My Mavens.[16]

_____

[15] The Amended Complaint's sequence of events refutes Plaintiff's contention that the "Oral Presentation" was part of "the onboarding process." (Am. Cmplt. (Dkt. No. 27) ¶ 49)  The "Oral Presentation" was necessary background for the "coding challenge," but it was not part of "the onboarding process" because – according to the Amended Complaint – Zhang had not yet undertaken the "coding challenge," and thus had not qualified for a position at My Mavens.

[16] In the Amended Complaint, My Mavens obfuscates the relationship between itself and Zhang by referring to Zhang as a "team member." (Am. Cmplt. (Dkt. No. 27) ¶ 31 ("As he did with every team member, by presenting the non-disclosure agreement to Defendant Zhang, Mr. Lang made clear that he would not be given access to any proprietary ideas or information before []he signed a non-disclosure agreement . . . ."), ¶ 48 ("The Oral Presentation, which typically lasted between 30 to 60 minutes, was given to all or nearly all team members, but only after they signed an NDA."))  The Complaint uses the term "candidates" and not "team members," however (see Cmplt. (Dkt. No. 1) ¶ 39 ("Plaintiff required all candidates to execute agreements identical to the Zhang NDA before being provided any of its confidential information.")), and in the Amended Complaint and in its opposition, My Mavens repeatedly refers to Zhang's "candidacy" and "interview." (Am. Cmplt. (Dkt. No. 27) ¶ 2 ("Prior to the interview process, Plaintiff demanded that Defendant Zhang execute a conservative and restrictive 10-year non-disclosure agreement . . . ."), ¶ 6 ("Zhang . . . withdrew his candidacy to join My Mavens."); ¶ 27 ("If the candidates passed the coding challenge and provided services building the code to bring the proprietary and confidential search functionalities to fruition, they would be rewarded with an equity ownership stake in Plaintiff."); ¶ 29 ("Zhang emailed Mr. Lang again expressing interest in participating in an interview process. . . ."); ¶ 44 ("Zhang agreed that he would not disclose Plaintiff's Confidential Information to which he would gain access to through the interview process. . . ."); ¶ 64 ("During the coding interview Defendant Zhang created code and a unit test . . . ."); Pltf.

In <u>State Street Global Advisors Trust Co. v. Visbal</u>, 431 F. Supp. 3d 322

(S.D.N.Y. 2020), the court considered whether parties' statements regarding a plan or desire to

work together in the future were (1) material and (2) reasonably relied upon.  In <u>State Street</u>, the

investment firm that had commissioned the well-known "Fearless Girl" sculpture sued the artist,

alleging, <u>inter alia</u>, breach of contract.  The artist counterclaimed, alleging that the investment

firm fraudulently induced her to enter into contracts to license and otherwise promote "Fearless

Girl" by falsely stating that, <u>inter alia</u>, it was "looking forward to [their] partnership and the

future" and "looking forward to continu[ing] [to] work with [her]."  <u>State Street</u>, 431 F. Supp. 3d

at 353 n.23.  The court held that "[t]he statements that [State Street] looked forward to working

with [the artist] . . . are not material because no reasonable person would have adjusted her

conduct in reliance on those statements.  These 'vague and general statements of optimism'

---

Opp. (Dkt. No. 45) at 20 ("the interview coding challenge"); at 26 ("after doing no work for
Plaintiff following the completion of the interview, Zhang unexpectedly withdrew his
involvement with Plaintiff"), at 33 (same))

Moreover, in the May 9, 2017 email in which Zhang ends his involvement with My Mavens, he
states: "Life is a bit hectic recently.  After [a] second thought, I don't think this is the right
timing for me to join this project."  Lang replies the next day:  "Sorry the timing isn't right now .
. . If you change your mind in the future feel free to reach out if life is a little less hectic."
(Weber Decl., Ex. B (Dkt. No. 44-2) at 2)  The statement that "the timing isn't right" reads as a
job candidate withdrawing an application or turning down an offer, and not – as the Amended
Complaint characterizes it – as a team member who is "inexplicably resign[ing]."  (Am. Cmplt.
(Dkt. No. 27) at p. 14, ¶ k)  And Lang's reaction is not that of a boss whose employee has just
resigned.

Finally, in the Amended Complaint, Plaintiff has deleted the allegation in the initial Complaint
that "[a]fter Defendant Zhang successfully completed [the] coding challenge interview, Plaintiff
asked that he join the My Mavens team . . . .  [and] Defendant Zhang agreed [before] Plaintiff
granted Defendant access to [the] cloud-based file . . . containing information about [the
Proprietary Functionalities]."  (Cmplt. (Dkt. No. 1) ¶ 40; Am. Cmplt. Redline (Dkt. No. 61-1) at
17)

In sum, it is clear that Zhang and My Mavens did not enter into an employment relationship at
any point, let alone by the time Zhang received the NDA and oral presentation.

cannot 'form the basis for a fraudulent inducement claim.'" Id. at 353 (quoting Sgaliordich v. Lloyd's Asset Mgmt., 1:10-CV-03669 ERK, 2012 WL 4327283, at *9 (E.D.N.Y. Sept. 20, 2012)). The court went on to note that "there is significant overlap between the materiality and reasonable reliance requirements" of a fraudulent inducement claim. Id. at 354.

 State Street is instructive here. Even accepting as true Plaintiff's illogical and implausible assertion that Zhang committed to accepting a job at My Mavens that he had not yet been offered, it would defy "'experience and common sense'" to construe a job applicant's pre-interview "assurances that he would provide . . . services" (Am. Cmplt. (Dkt. No. 27) ¶ 32) as either (1) material, or (2) a representation that could reasonably be relied upon by an employer. Warren v. Coca-Cola Co., No. 22-CV-6907 (CS), 2023 WL 3055196, at *5 n.6 (S.D.N.Y. Apr. 21, 2023) (quoting Iqbal, 556 U.S. at 663-64). The Amended Complaint alleges only the sort of "vague and general statements of optimism," State Street, 431 F. Supp. 3d at 353, that are pro forma in the job application process.[17]

 Nor has Plaintiff "(1) alleg[ed] facts to show that defendants had both motive and opportunity to commit fraud, or . . . (2) alleg[ed] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996) (citation omitted), as required to plead scienter. While

---

[17] The NDA's "No Obligations" and "Entire Agreement" clauses confirm that My Mavens did not rely on any past or future commitment of Zhang in disclosing information to him pursuant to the NDA. The "No Obligations" provision states that "[t]he furnishing of Confidential Information hereunder shall not obligate either party to enter into any further agreement or negotiation with the other, nor shall it obligate the Disclosing Party to refrain from entering into an agreement or negotiation with any other party." And the "Entire Agreement" clause states that "[t]his Agreement constitutes the entire Agreement between the parties and supersedes any prior or contemporaneous oral or written representations with regard to the subject matter hereof." (NDA (Dkt. No. 61-2) at 2) Given this language in the NDA that Plaintiff drafted, Plaintiff has not plausibly alleged that it made the Oral Presentation to Zhang because he had committed to perform work for My Mavens in the future.

Plaintiff alleges that Grubhub has derived "revenue . . . driven by discounts and other member loyalty promotions" (Am. Cmplt. (Dkt. No. 27) ¶ 81), the Amended Complaint makes no comparable allegations as to Zhang's financial or professional motive.  And as to "circumstantial evidence," Plaintiff alleges only that Zhang "[did] not respond[] to Plaintiff's correspondence" after the interview and then "unexpectedly withdrew his involvement with My Mavens."  (Id. ¶ 67)  But people interviewing for jobs routinely decide not to pursue certain opportunities for entirely innocent reasons.  Zhang's decision not to pursue the My Mavens opportunity does not constitute "strong . . . evidence" that "assurances" he provided to Lang were false when made.

Finally, My Mavens' allegations that "Zhang never intended to seek a position with My Mavens, nor did he intend to help Plaintiffs develop code" (Am. Cmplt. (Dkt. No. 27) ¶ 132) are conclusory, and are based solely on Zhang's lack of interest in pursuing the My Mavens opportunity after his success with the "coding challenge."  These allegations do not support the inference that Zhang's "assurances" were "a misrepresentation of present fact," rather than "an expression of a future expectation or intent to perform."  Pate, 163 A.D.3d at 430; cf. Laduzinski v. Alvarez & Marsal Taxand LLC, 132 A.D.3d 164, 168 (1st Dept. 2015) ("An at-will employee, who has been terminated, cannot state a fraudulent inducement claim on the basis of having relied upon the employer's promise not to terminate the contract, or upon any representations of future intentions as to the duration or security of his employment.") (citations omitted); Mañas v. VMS Assocs., 53 A.D.3d 451, 454 (1st Dept. 2008) (allegations that "'defendants did not intend to compensate plaintiff in conformity with the promises and assurances concerning the short and long-term compensation plans' . . . are not sufficient.  Rather, . . . they are merely general allegations that defendants entered into a contract while lacking the intent to perform it.") (quotations and brackets omitted).

For all these reasons, Zhang's motion to dismiss the fraudulent inducement claim will be granted.

**F.**   **Breach of Fiduciary Duty Claim Against Zhang**

**1.**   **Applicable Law**

"To prevail on a breach of fiduciary duty claim, a plaintiff must prove: '(1) a fiduciary duty existing between the parties; (2) the defendant's breach of that duty; and (3) damages suffered by the plaintiff [that] were proximately caused by the breach.' However, if a claim for fiduciary duty is premised on the same facts and seeking the identical relief [as a breach of contract claim], the claim for fiduciary duty is redundant and should be dismissed." Clarendon Nat. Ins. Co. v. Health Plan Administrators, No. 08 CIV. 6279GBD, 2009 WL 3053736, at *3 (S.D.N.Y. Sept. 24, 2009) (quoting Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd., No. 03 CIV. 5539 (NRB), 2004 WL 1444868, at *8 (S.D.N.Y. June 25, 2004); further citation omitted).

**2.**   **Analysis**

As an initial matter, the parties have not cited – and this Court has not found – any case holding that a job applicant owes a fiduciary duty to a potential employer. The only court that appears to have considered the notion has rejected it. See United States v. Turner, 465 F.3d 667, 675 (6th Cir. 2006) (dismissing honest services fraud indictment involving candidates for office because "[f]inding a fiduciary duty owed by candidates . . . would require finding that all job applicants owe a fiduciary duty to their potential employers"). And while Plaintiff argues that Zhang should be viewed as a "'partner[] ow[ing] fiduciary duties to co-partners'" – because "both Plaintiff and Zhang viewed the relationship as Zhang ultimately being a stake holder in the business, which means he would have a membership interest in [Plaintiff's] limited liability company" (Pltf. Opp. (Dkt. No. 45) at 43 (quoting Seagrape Invs. LLC v. Tuzman, No. 19-CV-

9736 (RA), 2020 WL 5751232, at *21 (S.D.N.Y. Sept. 25, 2020)) – the case law instead indicates that the possibility of a future fiduciary relationship does not give rise to a present fiduciary duty.  See Anadarko Petroleum Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1177 (Del. 1988) ("[A] fiduciary relationship d[oes] not exist between [a company's fiduciary] and [that company's] prospective stockholders.").

In any event, the Amended Complaint alleges only that (1) Zhang's fiduciary duty consisted of the "duty not to disclose . . . confidential information and trade secrets of Plaintiff"; and (2) "Defendant Zhang has breached his common-law [fiduciary] duties to Plaintiff by disclosing and/or using confidential information and trade secrets belong to Plaintiff."  (Am. Cmplt. (Dkt. No. 27) ¶¶ 142-43)  Because both the alleged duty and the alleged breach fall within the scope of the NDA, the breach of fiduciary duty claim against Zhang is duplicative of Plaintiff's breach of contract claim against Zhang.  Accordingly, Plaintiff's breach of fiduciary duty claim against Zhang will be dismissed.

### G.    Unjust Enrichment Claim Against Grubhub and Zhang

#### 1.    Applicable Law

"[I]n order to adequately plead [an unjust enrichment] claim, the plaintiff must allege 'that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'" Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (2012) (quoting Mandarin Trading Ltd. v Wildenstein, 16 N.Y.3d 173, 182 (2011)).

"[U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.  Typical cases are those in which the defendant, though guilty of no

wrongdoing, has received money to which he or she is not entitled.  An unjust enrichment claim

is not available where it simply duplicates, or replaces, a conventional contract or tort claim."

Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012) (citations omitted).

> **2.**      **Analysis**

Here, the Amended Complaint's unjust enrichment claim rests on the same factual

allegations as Plaintiff's breach of contract and tort claims.  Given these circumstances, the

unjust enrichment claim is duplicative of Plaintiff's contract and tort claims, and must be

dismissed. See Bytemark, 342 F. Supp. 3d at 512 ("Because (1) Plaintiff's unjust enrichment

claim under New York law is based on the same factual allegations underlying its contract and

tort claims; and (2) Plaintiff has not explained how its unjust enrichment claim differs from its

contract and tort claims, Plaintiff's unjust enrichment claim under New York law will be

dismissed as duplicative of its contract and tort claims."); Data Device Corp. v. W.G. Holt, Inc.,

No. 19-CV-4105(JS)(ARL), 2020 WL 7024312, at *7 (E.D.N.Y. Nov. 30, 2020) ("The

Complaint's breach of contract claim is premised on the allegation that [plaintiff's employee]

breached his contractual obligations by acquiring and using [plaintiff's] confidential information

for [another company's] benefit.  The unjust enrichment claim arises from the same alleged

misconduct:  that Defendants 'benefitted by selecting for development, developing and actually

selling competitive products – all through the exploitation of property, know-how and

proprietary works belonging exclusively to plaintiff.'  Accordingly, Defendants' motion to

dismiss Plaintiff's unjust enrichment claim . . . is granted."); MF Glob. Holdings v.

PricewaterhouseCoopers LLP, 43 F. Supp. 3d 309, 317 (S.D.N.Y. 2014) ("A plaintiff can plead

unjust enrichment as an alternative claim to breach of contract . . . only if there is 'a bona fide

dispute concerning existence of a contract or whether the contract covers the dispute in issue.'")

(quoting <u>Fantozzi v. Axsys Techs.</u>, No. 07 Civ. 02667, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008)).

Moreover, as to Grubhub, no unjust enrichment claim is cognizable, because My Mavens and Grubhub "simply had no dealings with each other." <u>Georgia Malone</u>, 19 N.Y.3d at 517-18.

In sum, Defendants' motions to dismiss Plaintiff's unjust enrichment claim will be granted.

**H.     <u>Civil Conspiracy Claim Against Grubhub and Zhang</u>**

"'To establish its claim of civil conspiracy, the [plaintiff] must demonstrate the primary tort, plus the following four elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.'" <u>ACR Sys. v. Woori Bank</u>, No. 14 CIV. 2817 (JFK), 2018 WL 1757019, at *6 (S.D.N.Y. Apr. 10, 2018) (quoting <u>World Wrestling Fed'n Entm't, Inc. v. Bozell</u>, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001)) (brackets in <u>ACR Sys.</u>).

"It is a well-settled principle of New York law that there is no independent cause of action for conspiracy to commit fraud." <u>Dover Ltd. v. A.B. Watley, Inc.</u>, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006).  Because "'New York does not recognize civil conspiracy to commit a tort as an independent cause of action, . . . a cause of action alleging conspiracy to commit a tort stands or falls with the underlying tort.'" <u>ExpertConnect, LLC v. Fowler</u>, 2019 WL 3004161, at *8 (S.D.N.Y. July 10, 2019) (quoting <u>Williams v. Williams</u>, 149 A.D.3d 1145, 1146 (2d Dept. 2017)).

Here, all of Plaintiff's substantive tort claims have been dismissed.  Accordingly, Plaintiff's civil conspiracy claim will likewise be dismissed.

## III.   MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Defendants have moved for summary judgment on (1) Plaintiff's trade secret and unfair competition claims, insofar as they relate to My Mavens' Dietary Preference Filter Functionality; and (2) Plaintiff's tortious interference claim, arguing that these claims are time-barred.  (Grubhub Mot. (Dkt. No. 41); Zhang Mot. (Dkt. No. 47))

Because Plaintiff's trade secret, unfair competition, and tortious interference claims will be dismissed, Defendants' motions for partial summary judgment will be denied as moot.

Similarly, Plaintiff's motion to strike the Bowersock declaration submitted in support of Defendants' motions for partial summary judgment (see Pltf. Opp. (Dkt. No. 45) at 12-13) will be denied as moot.

## IV.   LEAVE TO AMEND

Plaintiff seeks leave to amend, which Defendants oppose.  (Pltf. Opp. (Dkt. No. 45) at 44; Grubhub Reply Br. (Dkt. No. 46) at 17; Zhang Reply Br. (Dkt. No. 51) at 7)

District courts "'ha[ve] broad discretion in determining whether to grant leave to amend,'" United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 28 (2d Cir. 2016) (quoting Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000)), and leave to amend should generally be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).  A court may properly deny leave to amend, however, in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City of New York, No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule

15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile.").

Leave to amend may be denied on the basis of futility when the plaintiff has "presented no basis for the district court to believe [it] could allege facts withstanding a 12(b)(6) motion." Sprague v. Salisbury Bank & Tr. Co., 969 F.3d 95, 101 (2d Cir. 2020) (quotation omitted). Accordingly, courts routinely deny leave to amend claims that have been dismissed as duplicative. See, e.g., Starbucks Corp. v. New WTC Retail Owner LLC, No. 21 CIV. 400 (VM), 2021 WL 4868585, at *8 (S.D.N.Y. Oct. 18, 2021) ("The claim for the breach of the covenant of good faith and fair dealing . . . is dismissed with prejudice as duplicative of [the breach of contract claims]."); Washington v. Kellwood Co., No. 05 CIV. 10034 (DAB), 2009 WL 855652, at *8 (S.D.N.Y. Mar. 24, 2009) ("Because Plaintiffs' unfair competition claim is based entirely on alleged conduct that is proscribed by the express terms of the contract, and because Plaintiffs' Complaint provides no indication whatsoever of harm to the public or consumers arising from Defendant's alleged conduct, it would be futile to provide Plaintiffs leave to replead this cause of action."); Spanierman Gallery, PSP v. Love, No. 03 CIV.3188 VM, 2003 WL 22480055, at *4 (S.D.N.Y. Oct. 31, 2003) ("The Court will dismiss, with prejudice, the unjust enrichment and constructive trust claims as against [certain] Defendants because those claims are duplicative of the breach of contract claim and because, as above, Plaintiffs have failed to allege any distinct harm or actions giving rise to any separate claim of unjust enrichment or constructive trust.").

In moving for summary judgment, Defendants argued that (1) Plaintiff's trade secrets and unfair competition claims are time-barred in part, and (2) Plaintiff's tortious interference claims are time-barred in full. (Grubhub Br. (Dkt. No. 42) at 20-23, 25-27; Zhang Br. (Dkt. No. 49) at 5 (adopting Grubhub's arguments regarding statute of limitations issues))

Given that all of Plaintiff's claims will be dismissed, Defendants' motions for summary

judgment will be denied as moot.  But the Court has considered whether Defendants have

demonstrated that Plaintiff's trade secrets, unfair competition, and tortious interference claims

are time-barred, such that leave to amend should be denied as  futile.  See Ngono v. Owono, No.

21CIV95PGGSN, 2023 WL 2207587, at *9 (S.D.N.Y. Feb. 24, 2023) (denying leave to amend

as to time-barred claim because amendment would be futile); Burthey v. New York City Dep't of

Corr., No. 93 CIV. 3230LMMMHD, 2000 WL 739570, at *1 (S.D.N.Y. June 8, 2000) (same;

listing cases).

       A.      **Relevant Statutes of Limitations**

           1.      **Misappropriation of Trade Secrets**

      "A civil action [for violation of the DTSA] may not be commenced later than

[three] years after the date on which the misappropriation with respect to which the action would

relate is discovered or by the exercise of reasonable diligence should have been discovered.  For

purposes of [the statute of limitations], a continuing misappropriation constitutes a single claim

of misappropriation."  18 U.S.C. § 1836(d).

      "New York law governing the accrual of statutes of limitations is less permissive

for plaintiffs than the law under the DTSA."  Zirvi v. Flatley, 433 F. Supp. 3d 448, 461

(S.D.N.Y.), aff'd, 838 F. App'x 582 (2d Cir. 2020).  While "New York trade secret

misappropriation claims are governed by [a] three-year statute of limitations," Architectronics,

Inc. v. Control Sys., 935 F. Supp. 425, 432 (S.D.N.Y. 1996) (citing C.P.L.R. § 214(4)), the

accrual date is not based on notice.  Instead, under New York law, "a claim . . . 'accrues either

when defendant discloses the trade secret or when he first makes use of plaintiff's ideas.'"

iSentium, LLC v. Bloomberg Fin. L.P., No. 17-CV-7601 (PKC), 2020 WL 248939, at *8

(S.D.N.Y. Jan. 16, 2020) (quoting Inspired Capital, LLC v. Conde Nast, 2019 WL 2191249, at

*5 (S.D.N.Y. May 21, 2019)). "'The date of accrual may be extended under the continuing tort doctrine where the defendant has kept a secret confidential but continued to use it for commercial advantage. Where, however, the defendant discloses the secrets revealed to him, there can be no continuing tort of unlawful use.'" Id. (quoting Synergetics USA, Inc. v. Alcon Labs., Inc., 2009 WL 2016872, at *2 (S.D.N.Y. July 9, 2009)).

### 2.     Unfair Competition

"[A] claim for unfair competition is subject to a three-year statute of limitations. And . . . unfair competition is not a continuing tort." Enzo Biochem, Inc. v. Amersham PLC, 981 F. Supp. 2d 217, 227 (S.D.N.Y. 2013) (citing C.P.L.R. § 214(4); further citations omitted).[18]

### 3.     Tortious Interference

"[A] claim [for tortious interference] is . . . governed by a three-year statute of limitations, [and] is not a continuing tort." Andrew Greenberg, Inc. v. Svane, Inc., 36 A.D.3d 1094, 1099 (3d Dept. 2007) (citing C.P.L.R. § 214(4); further citations omitted). "'[T]he claim is not enforceable until damages are sustained,' and that point, 'rather than the wrongful act of defendant or discovery of the injury by plaintiff, is the relevant date for marking accrual.'" Id.

---

[18] Plaintiff argues that because "Defendants' conduct, as alleged in the [Amended] Complaint, 'more closely resembles that of fraud rather than an injury to property,' the 'statute of limitations akin to New York state fraud claims of six years applies.'" (Pltf. Opp. (Dkt. No. 45) at 15 (quoting Mario Valente Collezioni, Ltd. v. AAK Ltd., 280 F. Supp. 2d 244, 258 (S.D.N.Y. 2003)). Plaintiff is incorrect. An "unfair competition claim is subject to the three-year statute of limitations imposed by C.P.L.R. § 214(4)" where, as here, "the gravamen of [the] claim of unfair competition is the bad-faith misappropriation of a commercial advantage belonging to another by exploitation of proprietary information or trade secrets." Mopex, Inc. v. Am. Stock Exch., LLC, No. 02 CIV. 1656 (SAS), 2002 WL 342522, at *11 (S.D.N.Y. Mar. 5, 2002) (brackets, ellipsis, and quotation omitted), amended on other grounds, No. 02 CIV. 1656 (SAS), 2002 WL 523417 (S.D.N.Y. Apr. 5, 2002). Mario Valente is not on point, because it involves an unfair competition claim under the Lanham Act for "surreptitious selling in the territory of an exclusive distributorship." Indeed, the Mario Valente court distinguishes the three-year statute of limitations for a "state law unfair competition claim . . . akin to injury to property." Mario Valente, 280 F. Supp. 2d at 258.

(quoting <u>Kronos, Inc. v. AVX Corp.</u>, 81 N.Y.2d 90, 94, 96-97 (1993)).  In sum, a tortious

interference claim accrues, at the latest, when a contract is first breached as a result of the

defendant's interference.  <u>See</u> <u>Enzo Biochem</u>, 981 F. Supp. 2d at 225 (holding that tortious

interference claim "accrued . . . no later than" the date on which "[defendant] began purchasing

[the] products [at issue] from [plaintiff's distributor]" after "inducing [plaintiff's distributor] to

sell [the] products to [defendant] in breach of the [distributor-plaintiff] agreement"; plaintiff

"[could] not save its claim from time bar by alleging that [defendant] continued to interfere with

[the distributor-plaintiff] contract after [that date], because tortious interference is not a

continuing tort") (quotation omitted).

## B.    <u>Factual Background</u>

The factual background for Defendants' time-bar arguments is set forth in the

October 11, 2021 declaration of Grubhub Principal Product Manager Ryan Bowersock (Dkt. No.

43)

In his declaration, Bowersock describes his duties at Grubhub as follows:

> . . . I am currently employed as a Principal Product Manager at Grubhub Holdings
> Inc. ("Grubhub").  As a Principal Product Manager, my duties and
> responsibilities include working with various teams to assist in identifying and
> developing products or features that further customer needs and/or larger business
> objectives.  In my role, I have access to, and personal knowledge of, the matters
> and information set forth in this declaration.  The information set forth herein is
> true and correct of my own personal knowledge (unless otherwise stated) and if
> asked to testify thereto, I would do so competently. . . .

(<u>Id.</u> ¶ 2)

Bowersock has attached three emails to his declaration, which he states are "true

and correct cop[ies] of . . . internal Grubhub email[s] produced by Grubhub to Plaintiff pursuant

to the Court's preliminary discovery order of August 4, 2021 (ECF No. 32)." (<u>Id.</u> ¶¶ 3-5 and

Exs. A-C)  In his declaration, Bowersock provides no narrative regarding these emails.  (<u>Id.</u>)

Grubhub argues, however, that the emails demonstrate that Grubhub's dietary filter functionality was on its website for more than three years before the instant lawsuit was filed, rendering Plaintiff's trade secret claims partially time-barred, and rendering its unfair competition and tortious interference claims fully time-barred. (Grubhub Br. (Dkt. No. 42) at 20-23, 25-27)

In an August 19, 2016 email to – among other recipients – Grubhub internal listservs entitled "Product," "Product Delivery," and "Product Leads," Aaron Smith, the Director of Grubhub Diner Product Management, discusses Grubhub's implementation of a filter system that allows Grubhub users to have their searches directed to food that matches their dietary preferences:

> **Dietary Filter – Menu Page:** . . . Diners have often asked for a way to more easily find food that fits their dietary preferences. We have implemented a filter on the restaurant's menu that allows users to only view items that match their dietary preference. We have also added dietary badges to the Item view to clearly indicate what dietary preferences the item matches. The item level dietary facets include Vegetarian, Low-fat, Vegan, Dairy-Free, Gluten-free, and Nut-free. We've currently identified 75k+ items that match one or more dietary facets (item coverage of 1.57%) and are continually working the restaurant and data teams on increasing item coverage.

(Bowersock Decl., Ex. A (Dkt. No. 43-1) at 2)

In a January 23, 2017 email to Grubhub co-worker R.J. McNamara, Bowersock provides the following update concerning "the Dietary project":

> Just a heads up on where we're at with the Dietary project since it sounds like our plan is to coordinate some marketing effort around it . . .
>
> We're working on a data conversion on the back end that will tag a bunch of items as "Vegetarian" en masse based on analysis that our data scientists worked on. We're hoping that this conversion runs in the next few days and then we will . . . launch the Dietary related features to 50% of users for at least one week (note: we may run it for 50% of users for 28 days – let me know if/how that affects any of your marketing plans). After it runs exposed to 50% of users, the plan is to release it to 100% of users regardless of the results of the experiment (assuming it doesn't for some reason completely tank – which we're not expecting since we've run pieces of it before). Since the previous iterations, the main thing we changed

was to add a "BETA" tag to it and allow users to give feedback if they think
we've tagged items improperly (or any feedback on the feature for that matter).

(Id., Ex. B (Dkt. No. 43-2) at 2)  The email also includes "up-to-date screenshots of the

experience" of using the Dietary feature at that time.  (Id. at 2-3)

    In an April 17, 2017 email to a number of Grubhub employees with a cc to,

among others, Smith and McNamara, Bowersock provides additional information concerning

Grubhub's dietary filter.  In the email – which has the subject line "Dietary Beta Feedback from

Week 1" – Bowersock states:  "I went through and pulled all of the dietary feedback out of

clickstream from the past week while it's been exposed to 50% of users."  (Id., Ex. C (Dkt. No.

43-3) at 2)  Bowersock then summarizes the feedback concerning Grubhub's dietary filter from

"beta" users and suggests "actions required" to improve the feature.  (Id. at 2-3)

    In responding to Grubhub's partial motion for summary judgment, Plaintiff

moved to strike the emails attached to Bowersock's declaration, arguing, inter alia, that the

emails are inadmissible hearsay.  (Pltf. Opp. (Dkt. No. 45) at 12-13)

### C.  **Analysis**

    The Court agrees with Plaintiff that the emails attached to the Bowersock

declaration could not have been properly considered in connection with Defendants' partial

motion for summary judgment, and the Court further finds that they cannot be considered in

determining whether leave to amend should be granted.

    As to the former point, the emails are submitted for the purpose of demonstrating

that Grubhub – at or about the times specified in the emails – implemented a number of steps to

create a dietary filter on its website.  The emails are thus out-of-court statements being offered

for the truth of the matters asserted in them regarding steps that Grubhub has allegedly taken to

implement a dietary filter on its website.  They are thus inadmissible hearsay.  Given

Bowersock's duties and responsibilities at Grubhub, it appears likely that he has personal knowledge of the steps Grubhub has taken to implement a dietary filter on its website, and when those steps were taken, but Defendants chose not to submit a declaration or affidavit from Bowersock setting forth his knowledge concerning these matters. Nor did Defendants submit a declaration from a custodian of records or other qualified witness demonstrating that the emails are admissible as records of a regularly conducted business activity. See Fed. R. Evid. 803(6).

And given that the emails attached to the Bowersock declaration are not referenced in the Amended Complaint, they cannot be considered in determining whether leave to amend should be granted.

Because it appears likely that Plaintiff will seek leave to file a Second Amended Complaint, however, the Court will share with the parties its concern that a number of Plaintiff's claims may in fact be time-barred. These concerns must be addressed in briefing filed in support of any motion to file a Second Amended Complaint.

## 1. <u>Trade Secret Claims</u>

According to the internal Grubhub emails submitted by Defendants, by April 17, 2017, Grubhub's Dietary Filter had been available to half of Grubhub's millions of users for a week. (Bowersock Decl., Ex. C. (Dkt. No. 43-3) at 2) Accordingly, assuming <u>arguendo</u> that the Dietary Filter was a misappropriated trade secret, that misappropriation became public on or about April 10, 2017. The Complaint was filed on June 17, 2020, more than three years later. (Dkt. No. 1)

As discussed above, under New York law, any misappropriation claim with respect to the Dietary Filter would have accrued when the misappropriation became public. Assuming that Defendants' alleged misappropriation of the Dietary Filter became public on or

about April 10, 2017, Plaintiff's state law misappropriation claim would be time-barred under New York's three-year statute of limitations.

As to the DTSA claim, even if Plaintiff was not on actual notice of Grubhub's alleged misappropriation of the Dietary Filter until June 17, 2017 – when Lang says that he observed the dietary filter on Grubhub's website – the undisputed evidence and the Amended Complaint's allegations suggest that Plaintiff was on constructive notice before that date – i.e., had Plaintiff exercised due diligence, it would have discovered the purported misappropriation of the Dietary Filter trade secret before June 17, 2017.  By approximately April 10, 2017, the Dietary Filter was available in beta mode to half of Grubhub's users – approximately twelve million people.  (Bowersock Decl., Ex. C (Dkt. No. 43-3) at 2; Am. Cmplt. (Dkt. No. 27) ¶ 20 ("Grubhub . . . claims to have . . . nearly 24 million active diners."))  My Mavens' principal, Lang, was familiar with the Grubhub website, was among Grubhub's beta users, and noticed the "prominently displayed" dietary filter on Grubhub's website.  (Am. Cmplt. (Dkt. No. 27) ¶ 70 ("Lang noticed [the dietary filter] functionality . . . in 'beta' mode," and observed that the dietary filter was "prominently displayed"))

The evidence before the Court suggests that reasonable diligence would have revealed the "prominently displayed" new dietary filter feature on the website of the largest player in the online food ordering industry prior to June 2017.  And while Plaintiff claims that the beta release of the Dietary Feature was not "publicly disclosed" (Pltf. Opp. (Dkt. No. 45) at 14), this argument does not appear plausible, given the millions of beta users.  It thus appears that the DTSA claim accrued before June 17, 2017.[19]

---

[19] My Mavens argues that "Defendants should . . . be equitably estopped from relying on the statute of limitations as a defense," because "Zhang misrepresented that he 'didn't mention [to]

setTimeout

**D.**     **Unfair Competition Claim**

For the same reasons discussed above in connection with Plaintiff's common law trade secret misappropriation claim, the unfair competition claim would appear to be time-barred to the extent it is premised on the Dietary Preference Filter Functionality.

**E.**     **Tortious Interference Claim**

Any breach by Zhang of the NDA would, of course, have occurred before Grubhub made use of the information Zhang allegedly misappropriated from My Mavens. Accordingly, any tortious interference claim necessarily accrued before Grubhub first uploaded any of the features at issue to its website.

As discussed above, the evidence currently before the Court indicates that Grubhub launched its Dietary Filter on approximately April 10, 2017.  Accordingly, any breach of the NDA by Zhang must have occurred on or before that date, and My Mavens' tortious interference claim would have accrued on or about April 10, 2017.  The Complaint was not filed until June 17, 2020, however, which is more than three years later and outside the limitations period.

Accordingly, the tortious interference claim would appear to be time-barred.

*     *     *     *

While Plaintiff is granted leave to amend its trade secret, unfair competition, tortious interference, and civil conspiracy claims against Grubhub, any motion for leave to file a Second Amended Complaint must explain why there is a good faith legal argument that (1) the

---

anyone at Grubhub . . . what [My Mavens] was doing' to Plaintiff in the June [17,] 2017 email exchange . . . .  [and] Defendants should not be permitted to benefit from their own fraud." (Pltf. Opp. (Dkt. No. 45) at 15 n.1 (quoting Zhang Decl., Ex. A (Dkt. No. 48) at 4))  Whether Zhang made a misrepresentation in his June 17, 2017 email is irrelevant to whether My Mavens had notice of misappropriation before then, however.

DTSA and New York trade secret misappropriation and unfair competition claims are not time-barred as to the Dietary Preference Filter Functionality; and (2) the tortious interference claim is not time-barred.  Plaintiff's claim for unjust enrichment as to Grubhub will be dismissed with prejudice as duplicative of Plaintiff's tort claims against Grubhub.

As to Zhang, Plaintiff's claims for New York trade secret misappropriation, unfair competition, and breach of fiduciary duty will be dismissed with prejudice as duplicative of Plaintiff's breach of contract claim against Zhang; and Plaintiff's unjust enrichment claim will be dismissed with prejudice as duplicative of the contract and tort claims.  The DTSA, fraudulent inducement, and conspiracy claims against Zhang will be dismissed with leave to amend.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are granted; Grubhub's motion to strike is granted; Defendants' motion for partial summary judgment is denied as moot; and Grubhub's motion to strike is denied as moot.

Any motion for leave to file a Second Amended Complaint will be filed by **August 24, 2023**.  The proposed Second Amended Complaint and a redline to the Amended Complaint will be attached as exhibits to any such motion.  Any opposition is due by **September 5, 2023**.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 41, 47), and to mail a copy of this Order to pro se Defendant Zhang at the address on file.

Dated: New York, New York
      August 14, 2023

SO ORDERED.

_Paul A. Gardephe_
Paul G. Gardephe
United States District Judge